# EXHIBIT 1

**COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | | |
|---|---|---|
| THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY<br>400 Broadway, MS32<br>Cincinnati, Ohio 45202, | : <br> : <br> : <br> : <br> : | |
| WESTERN-SOUTHERN LIFE ASSURANCE COMPANY<br>400 Broadway, MS32<br>Cincinnati, Ohio 45202, | : <br> : <br> : <br> : <br> : | Case No. A1506581<br><br>Judge Beth A. Myers |
| COLUMBUS LIFE INSURANCE COMPANY<br>400 Broadway, MS32<br>Cincinnati, Ohio 45202, | : <br> : <br> : | **AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| INTEGRITY LIFE INSURANCE COMPANY<br>400 Broadway, MS32<br>Cincinnati, Ohio 45202,<br><br> and | : <br> : <br> : <br> : <br> : <br> : | |
| NATIONAL INTEGRITY LIFE INSURANCE COMPANY<br>400 Broadway, MS32<br>Cincinnati, Ohio 45202, | : <br> : <br> : <br> : | |
| Plaintiffs, | : <br> : | |
| v. | : <br> : | |
| U.S. BANK NATIONAL ASSOCIATION<br>425 Walnut Street<br>Cincinnati, OH 045202, | : <br> : <br> : <br> : | |
| Defendant. | : <br> : | |

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ...............................................................................................1

PARTIES ...................................................................................................................5

JURISDICTION AND VENUE ................................................................................7

FACTUAL ALLEGATIONS .....................................................................................7

I.      THE SECURITIZATION PROCESS..............................................................7

II.     U.S. BANK'S DUTIES AND OBLIGATIONS...............................................9

        A.      U.S. Bank's Duties Pertaining to the Delivery of Mortgage Files........11

        B.      U.S. Bank Had a Duty to Provide Notice of Defaults and
                Enforce Repurchase Obligations Triggered by Such Notice ................16

        C.      U.S. Bank's Duty to Act Prudently
                Upon the Occurrence of an Event of Default........................................18

        D.      U.S. Bank Had a Duty to Address the Master Servicers'
                and Servicers' Failure to Meet Prudent Servicing Standards ..............19

        E.      U.S. Bank Is Liable for Negligence in Performing Its Duties ..............21

III.    U.S. BANK BREACHED ITS
        CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES ..................21

        A.      U.S. Bank Is Aware of but Failed to
                Provide Notice of Defaults Relating to the Sponsors'
                and Originators' Pervasive Representation and Warranty Breaches ...................21

                1.      The Originators' and Sponsors' Pervasive
                        Breaches of Representations and Warranties............................31

        B.      U.S. Bank Failed to Act Prudently
                Upon the Occurrence of an Event of Default........................................34

                1.      Events of Default Under the PSAs Relating to
                        Document Delivery Failures in the Covered Trusts ................35

                2.      U.S. Bank Received Written Notice of Representation and
                        Warranty Violations Which Ripened into Events of Default ..................39

3.      Events of Default Concerning False Servicer Certifications ....................41

C.     U.S. Bank Failed to Address the Master
       Servicers' and Servicers' Looting of Trust Assets ................................................43

IV.    U.S. BANK SUFFERED FROM CONFLICTS OF INTEREST ......................................46

V.     U.S. BANK'S CONDUCT INJURED WESTERN & SOUTHERN ..............................48

CAUSES OF ACTION ................................................................................................................50

FIRST CAUSE OF ACTION (Violations of the TIA) ...............................................................50

SECOND CAUSE OF ACTION (Breach of Contract) ...............................................................51

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) .........................................................53

FOURTH CAUSE OF ACTION (Negligence—
Failure to Avoid Conflict of Interest and Perform Ministerial Acts with Due Care) ...................53

FIFTH CAUSE OF ACTION (Violation of the Streit Act).........................................................54

SIXTH CAUSE OF ACTION (Breach of the Covenant of Good Faith) ......................................55

PRAYER FOR RELIEF ..............................................................................................................56

The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, and National Integrity Life Insurance Company (collectively, "Western & Southern" or "Plaintiffs"), as holders of residential mortgage-backed securities ("RMBS") issued by certain Covered Trusts (defined below), by and through their attorneys, bring this action against Defendant U.S. Bank National Association ("U.S. Bank" or "Defendant" or "Trustee"), and allege as follows:

## NATURE OF ACTION

1. This action arises out of U.S. Bank's role as trustee for 14 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against U.S. Bank for breaches of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2. The Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2005 to 2007.  Seven of the RMBS transactions were sponsored by DLJ Mortgage Capital, Inc. (the "DLJ Trusts"), three were sponsored by CitiMortgage, Inc. and Citigroup Global Markets Realty Corporation (the "CitiMortgage Trusts"), two were sponsored by Goldman Sachs Mortgage Company (the "Goldman Sachs Trusts"), one was sponsored by J.P. Morgan Mortgage Acquisition Corporation (the "JPMorgan Trust"), and one was sponsored by Taylor, Bean & Whitaker Mortgage Corporation (the "TBW Trust") (DLJ Mortgage Capital, Inc., CitiMortgage, Inc. and Citigroup Global Markets Realty Corporation, Goldman Sachs Mortgage Company, J.P. Morgan Mortgage Acquisition Corporation, and Taylor, Bean & Whitaker Mortgage Corporation are referred to collectively as the "Sponsors").

3.      Western & Southern purchased RMBS certificates with a face value in excess of $218 million issued by the Covered Trusts identified in Exhibit B ("the Certificates"). Exhibit B identifies Certificates Western & Southern still holds (the "Held Certificates") and the Certificates Western & Southern has sold (the "Sold Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

5.      The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, U.S. Bank, to police the deal and to protect their contractual and other legal rights.

6.      As trustee for the Covered Trusts, U.S. Bank owes Western & Southern and the other certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts.  U.S. Bank and the relevant servicers (the "Servicers") and the relevant master

servicers (the "Master Servicers")[1] were required to provide notice of breaches of

representation and warranties provided by the Sponsors and the parties who originated the

mortgage loans underlying the Covered Trusts (the "Originators") concerning key attributes

of the mortgage loans underlying the Covered Trusts, including the origination guidelines

applicable to those loans and adherence to state laws regarding predatory lending.  U.S.

Bank had a duty to enforce the obligation of the responsible parties (typically the Sponsors,

affiliates that served as the depositors (the "Depositors"), or the Originators) to repurchase

loans that breached representation and warranty provisions or were missing required

documentation.  And U.S. Bank was required to address defaults by the Servicers and

Master Servicers who were required to engage in prudent loss mitigation practices.

7.     U.S. Bank was actively involved in the origination and servicing of mortgage

loans and typically had very close business relationships with the Sponsors, Originators, and

Depositors.  Nevertheless, as trustee, U.S. Bank was obligated to act against the financial

interest of the Sponsors when demanded by the circumstances.  U.S. Bank, however,

abandoned its obligations to protect the rights of investors.

8.     U.S. Bank's breaches of its contractual, fiduciary, and statutory duties gave

rise to six distinct legal claims.

9.     <u>Breach of Contract</u>.  U.S. Bank's contractual duties are set forth in governing

agreements, generally identified as pooling and servicing agreements ("PSAs").[2]  U.S. Bank

breached the PSAs by failing to: (i) provide notice of representation and warranty violations

---

[1] Some of the Covered Trusts employ a "Master Servicer" while others refer to the lead servicing entity as a Servicer.  References herein to the Servicer include the Master Servicer to the extent possible. Additionally, some of the Covered Trusts have Special Servicers as parties to the PSAs.  References herein to the Servicer also include the Special Servicer to the extent possible.
[2] Two of the Covered Trusts (GSR 2006-1F and GSR 2007-1F) were structured using Master Servicing and Trust Agreements, which are the functional equivalent of a PSA.  Unless expressly noted herein, when the term PSA is used, it is also referring to the aforementioned governing agreements executed in connection with those securitizations.

by the Sponsors and Originators; (ii) provide notice of the Servicers' and Master Servicers' failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to U.S. Bank under the PSAs upon the occurrence of an Event of Default.

10.     Breach of Fiduciary Duty.  Under common law, after an Event of Default an indenture trustee has a duty to act as a prudent person would in the exercise of his own affairs to protect the rights of certificateholders.  This duty continues until the Event of Default is cured.  U.S. Bank failed to meet its fiduciary duties because it was aware Events of Default had occurred, but failed to take action to force the responsible parties to repurchase loans with representation and warranty violations or missing documentation and failed to address breaches by the Servicers and Master Servicers.

11.     Violations of the TIA.  The TIA requires the Trustee to provide certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured.  U.S. Bank violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the certificateholders' interests by exercising all rights and remedies available to U.S. Bank under the PSAs.

12.     Violation of the Streit Act.  U.S. Bank violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of

certificateholders during the pendency of an "event of default." The Streit Act applies to the extent a PSA is not "qualified" under the TIA. Thus, to the extent the TIA is deemed to not apply to any particular "mortgage investments," the Streit Act provides a similar protection and remedy.

13.     Negligence. U.S. Bank had an extra-contractual duty to perform ministerial acts with due care and to avoid conflicts of interest. U.S. Bank negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the PSAs. U.S. Bank violated its duty of independence by failing to take action against the Sponsors, Originators, Depositors, Servicers, and Master Servicers because if U.S. Bank acted, it would have exposed systemic origination and servicing misconduct and would have jeopardized future lucrative engagements.

14.     Breach of Covenant of Good Faith. U.S. Bank violated the covenant of good faith and fair dealing by failing to give notice of defaults and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing required documentation.

15.     By failing to perform its duties, U.S. Bank has caused Western & Southern to suffer in excess of $100 million of damages.

## PARTIES

16.     Plaintiff The Western and Southern Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. It sells life insurance and annuity products.

17.     Plaintiff Western-Southern Life Assurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of

business in Cincinnati, Ohio.  It sells life insurance and annuity products.

18.     Plaintiff Columbus Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life, accident and health insurance, and annuity products.

19.     Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life, accident and health insurance, and annuity products.

20.     Plaintiff National Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of New York.  Its principal underwriting operations are located in Goshen, New York.  It primarily sells annuity products.  Its senior management is located in Cincinnati, Ohio and its investment decisions, including the decision to purchase the Certificates, are made by employees of the company or its affiliates in Cincinnati, Ohio.

21.     Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States.  U.S. Bank does business throughout the United States, with its main office located in Cincinnati, Ohio.  It serves as the trustee for the Covered Trusts.  For each of the Covered Trusts, U.S. Bank signed Certificates incorporating the PSAs.  As the trustee for the Covered Trusts, U.S. Bank owed certificateholders certain statutory, contractual, and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## JURISDICTION AND VENUE

22.     This Court has personal jurisdiction over U.S. Bank pursuant to Ohio Rev. Code Ann. § 2307.382 (i)(A)(1), (3), (4), (6), and (8).

23.     Venue is proper in this Court pursuant to Ohio R. Civ. P. 3(b)(2) because Western & Southern maintains its principal place of business in Hamilton County, Ohio and U.S. Bank has its main office in Cincinnati, Ohio.

24.     This Court has personal jurisdiction over U.S. Bank because U.S. Bank has its main office in Ohio.

## FACTUAL ALLEGATIONS

## I.     THE SECURITIZATION PROCESS

25.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage Originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

26.     The first step in each securitization is generally the acquisition of mortgage loans by a Sponsor (or "seller"), such as DLJ Mortgage Capital, Inc., and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

27.     The depositor then conveys the pool of loans to a trustee, such as U.S. Bank, pursuant to a PSA that establishes various prioritized tranches of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the

proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, U.S. Bank acted as the trustee in connection with the relevant RMBS transactions.

28.     Pursuant to the PSAs a servicer is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

29.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

30.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the waterfall.

31.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets

securing, the underlying loans, which often number in the thousands.

32.     U.S. Bank earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  U.S. Bank also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts.  U.S. Bank maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened U.S. Bank's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.    U.S. BANK'S DUTIES AND OBLIGATIONS

33.     U.S. Bank's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs and under applicable state and federal laws.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  U.S. Bank entered into PSAs with:

> (A) For one of the CitiMortgage Trusts (CMLTI 2006-WF2): (i) Citigroup Mortgage Loan Trust Inc., as Depositor; (ii) Wells Fargo Bank, N.A., as Servicer; and (iii) Citibank, N.A., as Trust Administrator;

> (B) For two of the CitiMortgage Trusts (CMSI 2006-5 and CMALT 2007-A7): (i) Citicorp Mortgage Securities, Inc., as Depositor; (ii) CitiMortgage, Inc., as Servicer and Master Servicer; and (iii) Citibank, N.A. as Paying Agent, Certificate Registrar, and Authenticating Agent;

> (C) For one of the DLJ Trusts (CSAB 2006-1): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank N.A., as Servicer, Master Servicer, and Trust Administrator; and (iv) Select Portfolio Servicing, Inc., as Servicer and Special Servicer;

> (D) For one of the DLJ Trusts (CSAB 2006-3): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank N.A., as Servicer, Master Servicer, and Trust Administrator; and (iv) Select Portfolio Servicing, Inc., as Servicer;

(E) For one of the DLJ Trusts (CSAB 2006-4): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank N.A., as Servicer, Master Servicer, and Trust Administrator; and (iv) Select Portfolio Servicing, Inc., as Servicer and Modification Oversight Agent;

(F) For one of the DLJ Trusts (CSAB 2007-1): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank N.A., as Servicer, Master Servicer, and Trust Administrator; (iv) Banco Popular De Puerto Rico, as Servicer; (v) GreenPoint Mortgage Funding, Inc., as Servicer and Seller; and (vi) Select Portfolio Servicing, Inc., as Servicer and Modification Oversight Agent;

(G) For one of the DLJ Trusts (HEMT 2005-5): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wilshire Credit Corporation, as Servicer; (iv) Ocwen Loan Servicing, LLC, as Servicer; and (v) Select Portfolio Servicing, Inc., as Servicer and Special Servicer;

(H) For one of the DLJ Trusts (HEMT 2006-4): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Select Portfolio Servicing, Inc., as Servicer; and (iv) Ocwen Loan Serving, LLC, as Servicer;

(I) For one of the DLJ Trusts (HEMT 2006-5): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Select Portfolio Servicing, Inc., as Servicer and Master Servicer; and (iv) Ocwen Loan Serving, LLC, as Servicer;

(J) For one of the Goldman Sachs Trusts (GSR 2006-1F): (i) GS Mortgage Securities Corporation, as Depositor; (ii) Wells Fargo Bank, N.A., as Securities Administrator and Master Servicer; and (iii) JPMorgan Chase Bank, N.A., as Custodian;

(K) For one of the Goldman Sachs Trusts (GSR 2007-1F): (i) GS Mortgage Securities Corporation, as Depositor; (ii) Deutsche Bank National Trust Company, as Custodian; and (iii) Wells Fargo Bank, N.A., as Securities Administrator;

(L) For the JPMorgan Trust: (i) J.P. Morgan Acceptance Corporation I, as Depositor; (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iii) Pentalpha Surveillance LLC, as Trust Oversight Manager; and

(M) For the TBW Trust: (i) BNP Paribas Mortgage Securities LLC, as Depositor; and (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities

Administrator.

**A.      U.S. Bank's Duties Pertaining to the Delivery of Mortgage Files**

34.      Each PSA sets forth a process for conveying the mortgage loans to the
Covered Trusts.  Typically, the Sponsors conveyed the loans to the Depositor for the
Covered Trusts.  Then the Depositor conveyed the mortgage loans to U.S. Bank in its
capacity as trustee for the Covered Trusts to hold for the benefit of the certificateholders.
This process is set forth in Section 2.01 ("Conveyance of Trust Fund") of the DLJ PSA,[3]
which provides in relevant part:

> The Depositor hereby sells, transfers, assigns, delivers, sets over
> and otherwise conveys to the Trustee in trust for the benefit of the
> Certificateholders, without recourse, the Depositor's right, title and
> interest in and to (a) the Mortgage Loans listed in the Mortgage
> Loan Schedule, including all interest and principal received or
> receivable by the Depositor on or with respect to the Mortgage
> Loans after the Cut-off Date, but not including payments of
> principal and interest due and payable on the Mortgage Loans on
> or before the Cut-off Date, together with the Mortgage Files
> relating to the Mortgage Loans . . . .

The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts set forth a
substantially similar process.  *See* Ex. C § I.

35.      In addition, Section 2.02 of the DLJ PSA ("Acceptance by Trustee") provides
that the Trustee is required to take physical possession of the mortgage loans and the
accompanying mortgage files for the exclusive use and benefit of all current and future
certificateholders.  It provides:

> [T]he Trustee *acknowledges receipt* of the documents referred to in
> Section 2.01 above and declares that it holds and will hold such
> documents and the other documents delivered to it constituting the

---

[3] Quotations to the DLJ PSA herein are to the PSA executed in connection with the CSAB 2006-1 Trust.  CSAB
2006-3, CSAB 2006-4, CSMC 2007-1, HEMT 2005-5, HEMT 2006-4, and HEMT 2006-5 were issued pursuant to
PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Amended
Complaint.

Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of the Trust Fund in trust for the exclusive use and benefit of all present and future Certificateholders.

(Emphasis added).  The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts set forth a substantially similar process.  *See* Ex. C § II.

36.    Section 2.01 of the DLJ PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans.  It provides that the Depositor has delivered or caused to be delivered:

[T]he documents and instruments with respect to each Mortgage Loan assigned:

(i) (A) the original Mortgage Note bearing all intervening endorsements and including any riders to the Mortgage Note, endorsed "Pay to the order of _____, without recourse" and signed in the name of the last named endorsee by an authorized officer . . .;

(ii) the original of any guarantee executed in connection with the Mortgage Note (if any);

(iii) for each Mortgage Loan that is not a MERS Mortgage Loan, the *original Mortgage, with evidence of recording thereon*, or copies certified by the related recording office or if the original Mortgage has not yet been returned from the recording office, a copy certified by or on behalf of the Seller indicating that such Mortgage has been delivered for recording (the return directions for the original Mortgage should indicate, when recorded, mail to the Seller) and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the related Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iv) *the originals of all assumption, modification, consolidation or extension agreements*, (or, if an original of any of these documents

12

has not been returned from the recording office, a copy thereof certified by or on behalf of the Seller, the original to be delivered to the Seller forthwith after return from such recording office) with evidence of recording thereon, if any;

(v) for each Mortgage Loan that is not a MERS Mortgage Loan, the *original Assignment of Mortgage as appropriate*, in recordable form, for each Mortgage Loan from the last assignee assigned in blank;

(vi) for each Mortgage Loan that was not a MERS Mortgage Loan at its origination, *the originals of any intervening recorded Assignments of Mortgage, showing a complete chain of assignment* from origination to the last assignee, including warehousing assignments, with evidence of recording thereon (or, if an original intervening Assignment of Mortgage has not been returned from the recording office, a copy thereof certified by or on behalf of the Seller, the original to be delivered to the Custodian forthwith after return from such recording office);

(vii) the original mortgage title insurance policy, or copy of title commitment (or in appropriate jurisdictions, attorney's opinion of title and abstract of title) . . . .

(Emphasis added).  The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts set forth a substantially similar process.  *See* Ex. C § III.

37.    Physical possession of these documents by U.S. Bank was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

38.    After a designated period, U.S. Bank, or a custodian on its behalf, was required to issue a final certification and exception report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C § IV.  When a custodian fulfilled this role, it acted as an agent or on behalf of the Trustee.  For example, the DLJ PSA provides that "[the Custodians], each of which shall act as an agent on behalf of the Trustee" and that the "Custodian agrees to hold any of the documents or instruments

referred to in Section 2.01 of this Agreement as agent for the Trustee."  The PSAs for the

CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain substantially similar

provisions.  *See* Ex. C § XIII.  The HEMT 2005-5 PSA provides that "[e]ach Custodian so

appointed shall act as agent on behalf of the Trustee, and shall be compensated by the Depositor.

The Trustee shall remain at all times responsible under the terms of this Agreement,

notwithstanding the fact that certain duties have been assigned to a Custodian."  The PSAs for

the CMALT 2007-A7, CMSI 2006-5, HEMT 2006-4 and HEMT 2006-5 Trusts contain language

that similarly makes clear that the custodian is an agent of the Trustee and that if the Trustee

chooses to act through a custodian, it remains liable for the acts of the custodian.  *See id.*

      39.    The "Form of Final Certification of Trustee," which was attached to the DLJ

PSA as Exhibit K, provides:

> Ladies and Gentlemen:
>
> In accordance with and subject to the provisions of Section 2.02 of the above-referenced Pooling and Servicing Agreement *the undersigned, as Trustee, hereby certifies that, except for the exceptions noted on the schedule attached hereto, as to each Mortgage Loan listed in the Mortgage Loan Schedule it has reviewed the Mortgage File and has determined that (based solely on its review of each such documents on its face) (i) all documents* described in clauses (i)-(v) of Section 2.01(b) *of the Pooling and Servicing Agreement are in its possession*, (ii) such documents have been reviewed by it and have not been mutilated, damaged, defaced, torn or otherwise physically altered and such documents relate to such Mortgage Loan and (iii) *each Mortgage Note has been endorsed and each assignment of Mortgage has been delivered as provided in Section 2.01 of the Pooling and Servicing Agreement*. The Trustee has made no independent examination of any documents required to be delivered in accordance with Section 2.01 of the Pooling and Servicing Agreement beyond the review specifically required therein. The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents required to be delivered in accordance with Section 2.01 of the Pooling and Servicing Agreement or any of the Mortgage Loans identified on the

> Mortgage Loan Schedule, or (ii) the collectibility, insurability, effectiveness or suitability of any such Mortgage Loan. . . .
>
> U.S. BANK NATIONAL ASSOCIATION,
> as Trustee

(Emphasis added).  The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts set forth a substantially similar process.  *See* Ex. C § V.

40.    The final certification is the key certification that U.S. Bank (or a custodian on its behalf) was required to prepare for the Covered Trusts.  In this document, U.S. Bank certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) U.S. Bank had not obtained complete required documentation for those loans identified on the document exception report.  If there was a defect with any mortgage file, then the Sponsor, relevant seller, or responsible party was obligated cure the defect leading to the exception (typically within 90 days) or repurchase or substitute the defective loans.  This is set forth in Section 2.02 of the DLJ PSA, which provides:

> If, in the course of such review, the Custodian finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Custodian shall list such as an exception in the Trust Receipt and Final Certification pursuant to Section 6 of the Custodial Agreement; *provided, however*, that the Custodian shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. The Seller shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if the Seller does not correct or cure such defect within such period and such defect materially and adversely affects the interests of Certificateholders in the related Mortgage Loan, the Seller shall either (a) substitute for the related Mortgage Loan a Qualified Substitute Mortgage Loan, which substitution shall be

15

> accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) repurchase such Mortgage Loan within 90 days from the date the Seller was notified of such defect in writing at the Purchase Price of such Mortgage Loan; or such longer period not to exceed 720 days from the Closing Date if the substitution or repurchase of a Mortgage Loan pursuant to this provision is required by reason of a delay in delivery of any documents by the appropriate recording office. . . .

(Emphasis in original). The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain a substantially similar form of final certification. *See* Ex. C § VI.

41.    Repurchases under Section 2.02(a) are to occur "in the manner and subject to the conditions in Section 2.03."  Section 2.03 makes clear that the Servicer and the Trustee both have an obligation to enforce this repurchase provision as it provides for reimbursement of expenses incurred in such enforcement.  The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain substantially similar provisions. *See* Ex. C § VI.

42.    After the passage of a specified period of time, the Servicer and Trustee could not seek substitution of loans and could merely demand repurchase.  For example, Section 2.03 of the DLJ PSA provides that substitution is not an available remedy more than two years from closing.  The PSAs for the CitiMortgage, JPMorgan, and TBW Trusts have similar cutoffs. *See id.*

**B.    U.S. Bank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice**

43.    The Trustee had an obligation pursuant to the PSAs to provide notice to all parties of the Sponsors' or Originators' breaches of representations and warranties under the PSAs or Mortgage Loan Purchasing Agreements ("MLPA").  For example, Section 2.03 of the DLJ PSA provides:

Upon discovery by any of the parties hereto of a breach of a representation or warranty made pursuant to Section 2.03(b) that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties. Each Seller hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made by it pursuant to Section 2.03(b) which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan sold by such Seller to the Trust, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a 'Deleted Mortgage Loan') from the Trust Fund and substitute in its place a Qualified Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans at the Purchase Price in the manner set forth below. . . . Such Seller shall promptly reimburse the Trustee, the Trust Administrator and the related Servicer for any actual out-of-pocket expenses reasonably incurred by the Trustee, the Trust Administrator and such related Servicer in respect of enforcing the remedies for such breach. . . .

The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain substantially similar provisions. *See* Ex. C § VI.

44. Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustee. 15 U.S.C. § 77bbb.

45. Under Section 315(b) of the TIA, U.S. Bank was required to give certificateholders notice of a default under the PSAs within 90 days of learning of such default. 15 U.S.C. § 77ooo(b).

46. As set forth in Section III hereof, U.S. Bank failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law, and the TIA.

C.     U.S. Bank's Duty to Act Prudently
       Upon the Occurrence of an Event of Default

47.     Under the PSAs and applicable law, U.S. Bank owed a fiduciary duty to

certificateholders upon the occurrence of an Event of Default.  U.S. Bank's post-default

fiduciary duties are described in Section 9.01 of the DLJ PSA, which provides in relevant

part, "the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and

use the same degree of care and skill in their exercise, as a prudent person would exercise or use

under the circumstances in the conduct of such person's own affairs."  The PSAs for the

CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts impose substantially similar

obligations on U.S. Bank.  *See* Ex. C § VII.

48.     The duty to act prudently to protect the interests of certificateholders is a

continuing duty that remains in effect until the Event of Default is cured.

49.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a

default, the indenture trustee must exercise such of the rights and powers vested in it by the

indenture, and must use the same degree of care and skill in its exercise as a prudent man

would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C.

§ 77ooo(c).

50.     The Streit Act provides that upon the occurrence of an Event of Default, an

indenture trustee must exercise such of the rights and powers vested in it by the indenture,

and must use the same degree of care and skill in its exercise as a prudent man would

exercise or use under the circumstances in the conduct of his own affairs.

51.     Upon the occurrence of an Event of Default, a prudent trustee would have

exercised all of its rights under the PSAs to ensure that defaulted loans that were eligible for

repurchase or substitution due to representation and warranty violations or because they were

missing required documentation were put back to the responsible parties.  A prudent trustee would have also taken steps to remedy servicing breaches that increased the loss severities dramatically on the underlying mortgage loans.

52.     As set forth in Section III, U.S. Bank failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

> **D.     U.S. Bank Had a Duty to Address the Master Servicers'
> and Servicers' Failure to Meet Prudent Servicing Standards**

53.     Each PSA required the Master Servicers or Servicers to service the loans underlying the Covered Trusts prudently.

54.     For example, Section 3.03 of the DLJ PSA provides: "In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with this Agreement and with customary and usual standards of practice of prudent mortgage loan master servicers." The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain substantially similar requirements.  *See* Ex. C § VIII.

55.     The PSAs for the CitiMortgage, DLJ, Goldman Sachs, JPMorgan, and TBW Trusts provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default.  For example, Section 8.01 of the DLJ PSA provides that an Event of Default is triggered by:

> any failure by the Master Servicer or a Servicer to observe or
> perform in any material respect any other of the covenants or
> agreements on the part of the Master Servicer or the Servicer
> contained in this Agreement . . . which failure (i) materially affects
> the rights of the Certificateholders and (ii) shall continue
> unremedied for a period of 60 days after the date on which written
> notice of such failure shall have been given to the Master Servicer
> or the Servicer by the Trust Administrator or the Depositor, or to
> the Master Servicer or the Servicer and the Trust Administrator by
> the Holders of Certificates evidencing not less than 25% of the
> Voting Rights evidenced by the Certificates.

*See* Ex. C § IX.

56.      Further, the PSA for the CMLTI 2006-WF2 Trust provides that the failure to follow prudent servicing standards is also an Event of Default 30 days after a servicing officer becomes aware of such breach, without regard to whether notice is provided.  *See* Ex. C § IX.

57.      Upon a Master Servicer or Servicer default or Event of Default, the Trustee was obligated to act.  As discussed in Section II(B), the Trustee had a duty to provide notice when it became aware of breaches of the PSA by the Servicers or the Master Servicer.  If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults.  For example, the DLJ PSA provides that once a Master Servicer or Servicer Event of Default occurred, the trust administrator "shall [at the direction of the trustee] terminate all of the rights and obligations of the Master Servicer or Servicer," *see* DLJ PSA § 8.01 (*see also* Ex. C § VIII), and "shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer or such Servicer, as applicable, by the terms and provisions hereof," *see* DLJ PSA § 8.02.  The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts impose substantially similar obligations on U.S. Bank.  *See* Ex. C §§ IX, X.  More generally, U.S. Bank, as trustee, had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so with due care.

58.      As set forth in Section III, U.S. Bank breached its statutory, fiduciary, and contractual duties by failing to take actions to address Master Servicers and Servicer defaults and Events of Default.

20

**E.** **U.S. Bank Is Liable for Negligence in Performing Its Duties**

59.     Section 9.01 of the DLJ PSA provides in relevant part:

> No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own misconduct, its negligent failure to perform its obligations in compliance with this Agreement, or any liability which would be imposed by reason of its willful misfeasance or bad faith.

The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain substantially similar provisions.  *See* Ex. C § VII.

60.     Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust.  U.S. Bank can be held liable for its own negligence in failing to perform its requisite ministerial acts, which includes, among other things, its responsibilities to: (i) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitization trusts loans that breached such representations and warranties; and (ii) provide notices of servicing related breaches known to the Trustee.

61.     Every trustee—including U.S. Bank—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and arises independently of the PSAs.

**III.   U.S. BANK BREACHED ITS
        CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES**

**A.     U.S. Bank Is Aware of but Failed to
        Provide Notice of Defaults Relating the Sponsors'
        and Originators' Pervasive Representation and Warranty Breaches**

62.     U.S. Bank failed to give notice of defaults that occurred when the Sponsors or

Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines.  In reality, during the 2005 to 2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

       63.    For example, in Schedule III to the PSA for the DLJ Trust, the Seller made the following representations and warranties:

> (i) The information set forth in Schedule I, with respect to the DLJMC Mortgage Loans, is complete, true and correct in all material respects; . . .

> (iii) All payments due prior to the Cut-off Date for such Mortgage Loan have been made as of the Closing Date, the Mortgage Loan is not 30 days or more delinquent in payment; there are no material defaults under the terms of the Mortgage Loan;

> (iv) All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or escrow funds have been established in an amount sufficient to pay for every such escrowed item which remains unpaid and which has been assessed but is not yet due and payable;

> (v) The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded or sent for recording to the extent any such recordation is required by law, or, necessary to protect the interest of the Depositor. . . . ;

> (vi) The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense . . . ;

> (vii) All buildings or other customarily insured improvements upon the Mortgaged Property are insured by an insurer acceptable under the FNMA Guides . . . ;

> (viii) Each Mortgage Loan at the time it was made complied in all material respects with applicable federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit

opportunity, disclosure and predatory and abusive lending laws applicable to the Mortgage Loan;

(ix) The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Mortgaged Property, . . . ;

(x) The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency, moratorium, reorganization and other laws of general application affecting the rights of creditors and by general equitable principles; . . .

(xv) The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan;

(xvi) Each Mortgage Loan has been serviced in all material respects in compliance with accepted servicing practices; . . .

(xviii) The Mortgage Loan complies with all the terms, conditions and requirements of the originator's underwriting standards in effect at the time of origination of such Mortgage Loan;

(xix) The Seller has delivered or caused to be delivered to the Trustee or the Custodian on behalf of the Trustee the original Mortgage bearing evidence that such instruments have been recorded in the appropriate jurisdiction where the Mortgaged Property is located as determined by the Seller . . . ;

(xx) The Mortgage File contains each of the documents specified in Section 2.01(b) of this Agreement;

(xxi) With respect to each Cooperative Loan, the Cooperative Shares that is pledged as security for the Cooperative Loan is held by a person as a tenant-stockholder (as defined in Section 216 of the Code) in a cooperative housing corporation (as defined in Section 216 of the Code); . . .

(xxvii) None of the Mortgage Loans sold by any Seller are classified as (a) a "high cost mortgage" loan under the Home Ownership and Equity Protection Act of 1994 or (b) a "high cost

home," "covered," "high-cost," "high-risk home," or "predatory" loan under any other applicable state, federal or local law; . . .

(xxix) Each Mortgage Loan that is secured by residential real property (or a leasehold interest therein) has a loan-to-value ratio of 100% or less by Cut-Off Date Principal Balance;

(xxx) No Mortgage Loan sold by any Seller is a "High Cost Loan" or "Covered Loan", as applicable, as such terms are defined in the Standard & Poor's LEVELS® Glossary, Appendix E, in effect as of the Closing Date. . . ."

DLJ PSA, Schedule III.  The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain substantially similar provisions.  *See* Ex. C § XI.

64.     As noted in Section II(B), each party, including the Trustee, had an obligation to provide notice of breaches of these representations and warranties and such notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the defective loans.  *See also* Ex. C § VI.

65.    U.S. Bank knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders learned of such problems.

66.    U.S. Bank served as trustee for hundreds, if not thousands, of RMBS trusts from 2004 to 2007, including for many transactions involving the Sponsors and Originators.  In the course of administering these trusts, U.S. Bank learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending, and failed to ensure mortgage loans complied with state and federal laws.

67.    For example, while serving as trustee for various RMBS trusts, U.S. Bank was presented with a large number of defaulted loans that were originated by the Sponsors and Originators here, and foreclosures were commenced often in U.S. Bank's name.

68.     Indeed, U.S. Bank commenced foreclosure actions from 2005 to 2008 for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

(A) Countrywide Home Loans, Inc. served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Godfrey*, Summit C.P. No. CV-10-053370 (May 11, 2010); *U.S. Bank Nat'l Ass'n v. Lynch*, Montgomery C.P. No. CV-08-2702 (Mar. 20, 2008); *U.S. Bank Nat'l Ass'n v. Weber*, Montgomery C.P. No. CV-07-01644 (2007); *U.S. Bank Nat'l Ass'n v. Houston*, Montgomery C.P. No. CV-07-03070 (2007).

(B) Credit Suisse Financial Corporation served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Bratcher*, Summit C.P. No. CV-08-75043 (2008); *U.S. Bank Nat'l Ass'n v. Knoepfle*, Montgomery C.P. No. CV-08-0727 (Jan. 22, 2008) (initiating action for loan included in the CSMC 2007-1 Trust).

(C) GreenPoint Mortgage Funding, Inc. served as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Edmondson*, Montgomery C.P. No. CV-07-01319 (Feb. 12, 2007).

(D) JPMorgan Chase Bank, N.A. served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Bresich*, Medina C.P. No. CV-10-0757 (Apr. 26, 2010); *U.S. Bank Nat'l Ass'n v. Siminou*, No. 105742/2008 (N.Y. Sup. Ct. 2008).

(E) New Century Mortgage Corporation served as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Murphy*, Montgomery C.P. No. CV-11-04506 (Jun. 23, 2011); *U.S. Bank Nat'l Ass'n v. Tiku*, Montgomery C.P. No. CV-07-02524 (Mar. 27, 2007); *U.S. Bank Nat'l Ass'n v. Yeldell*, Montgomery C.P. No. CV-07-01123 (Feb. 6, 2007).

(F) Wells Fargo Bank, N.A. served as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Clark*, Medina C.P. No. CV-110589 (Apr. 14, 2011) (initiating action for loan included in the CMLTI 2006-WF2 Trust); *U.S. Bank Nat'l Ass'n v. Willoughby*, Montgomery C.P. No. CV-11-00540 (Jan. 21, 2011) (initiating action for loan included in the CMLTI 2006-WF2 Trust); *U.S. Bank Nat'l Ass'n v. Walker*, Montgomery C.P. No. CV-12-07346 (Oct. 12, 2012) (initiating action for loan included in the CMLTI 2006-WF2 Trust).

(G) WMC Mortgage Corporation served as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. O'Connor*, Montgomery C.P. No. CV-08-01104 (Feb. 6, 2008); *U.S. Bank Nat'l Ass'n v. Jones*, Montgomery C.P. No. CV-11-05352 (Jul. 27, 2011) (initiating action for loan included in the CMLTI 2006-WF2 Trust).

69.     Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, the Trustee had a duty to examine foreclosure filings.  *See, e.g.*, DLJ PSA § 9.01 ("The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement shall examine them to determine whether they conform to the requirements of this Agreement.").

70.     Through its review of these filings, U.S. Bank knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

71.     Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed in Exhibit F, demonstrated that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans, and failed to meet state and federal lending guidelines.  While investors such as Western & Southern lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, U.S. Bank had knowledge of specific problems with specific loans, as well as access to the mortgage loan files.  At a minimum, in its role as trustee to hundreds of RMBS trusts, U.S. Bank was privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts.  Having caught wind of the problem, U.S. Bank had statutory and common law duties requiring them to "nose to the source."

72.      U.S. Bank also commenced repurchase actions against Sponsors or Originators at issue here.  For example, at the direction of certain certificateholders, U.S. Bank, in its role as trustee or securities administrator, commenced actions against, among other entities, DLJ Mortgage Capital Inc. (the Originator of loans included in five of the Covered Trusts) to compel repurchase of loans that breached representations and warranties. *See, e.g.*, Compl., *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 652699/2013 (N.Y. Sup. Ct. Jan 6, 2014).

73.      In another repurchase action that U.S. Bank brought against Countrywide Home Loans, Inc. (the Originator of loans included in GSR 2006-1F Trust), U.S. Bank stated in its complaint that "[s]oon after being sold to the Trust, Countrywide's loans began to become delinquent and default at a startling rate."  *See* Compl., *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011).  U.S. Bank stated that a forensic review conducted before filing the complaint revealed that "an extraordinary sixty-six percent" of the sampled loans breached one or more of the mortgage loan representations and warranties.  Additionally, U.S. Bank stated that this was consistent with "Countrywide's abject failure to abide by the very representations and warranties it consistently made to induce the purchase of its Loans for securitizations, including the purchase of the Loans by the Trust."

74.      U.S. Bank also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

75.      Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  The Sponsors of the mortgage loans made representations and warranties concerning

the underwriting standards of the loans in the governing agreements for the insured RMBS. The governing agreements for the insured RMBS transactions had a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan Sponsor and the parties to the agreement, including the trustee.

76.     Monoline insurers have filed many complaints against Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with other RMBS trusts. Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue.

77.     For example, in *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*, No. 603751/2009 (N.Y. Sup. Ct. Feb. 11, 2010), MBIA Insurance Corp. ("MBIA") sued numerous defendants, including DLJ Mortgage Capital, Inc., who served as Sponsor of seven Covered Trusts and originated loans in five of the Covered Trusts. *Id.* MBIA reported that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed. *Id.* Of the 1,798 loan files that were reviewed by MBIA, approximately 85% contained one or more breaches of the mortgage loan representations. *Id.*

78.     Similarly, in *Assured Guaranty v. DLJ Mortgage Capital Inc.*, No. 652837/2011 (N.Y. Sup. Ct. Oct. 17, 2011) and *Financial Guaranty Insurance Company v. Credit Suisse Securities (USA) LLC*, No. 651178/2013 (N.Y. Sup. Ct. Apr. 2, 2013) monoline insurers sued DLJ Mortgage Capital, Inc. Both plaintiffs reported that defendants securitized loans that breached representations and warranties. In fact, Assured Guaranty conducted a forensic re-underwriting of 7,918 loans, which revealed that 93%, or 7,338, of the loans it reviewed

breached at least one of the representation and warranties provided in the relevant governing agreements.

79.     Additionally, Ambac Assurance Corporation, MBIA, and Syncora Guarantee each brought actions against Countrywide Home Loans, Inc. alleging breach of representations and warranties.  *See* Compl., *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 653979/2014 (N.Y. Sup. Ct. Dec. 30, 2014); Am. Compl., *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2009 (N.Y. Sup. Ct. Aug. 24, 2009); Compl., *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, No. 650042/2009 (N.Y. Sup. Ct. May 6, 2010). Monoline insurers also brought suits against JPMorgan Chase Bank, N.A. and GreenPoint Mortgage Funding, Inc. alleging both defendants breached representations and warranties. Compl., *Assured Guaranty Corp. v. EMC Mortg. LLC*, No. 650805/2012 (Mar. 15, 2012); Compl., *CIFG Assurance N. Am., Inc. v. GreenPoint Mortg. Funding, Inc.*, No. 652449/2012 (N.Y. Sup. Ct. Mar. 4, 2013).

80.     U.S. Bank received notice of several of the above referenced monoline actions as it was the trustee or indenture trustee for several of the trusts, including Covered Trusts at issue here.  *See Assured Guaranty v. DLJ Mortg. Capital, Inc.*, No. 652837/2011 (N.Y. Sup. Ct. Oct. 17, 2011) (CSAB 2006-3 and CSAB 2006-4 as trustee); *Assured Guaranty v. DLJ Mortg. Capital Inc.*, No. 652837/2011 (N.Y. Sup. Ct. Oct. 17, 2011) (HEMT 2006-2 as indenture trustee); *MBIA Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 603751/2009 (N.Y. Sup. Ct. Feb. 11, 2010) (HEMT 2007-2 as trustee); *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 653979/2014 (N.Y. Sup. Ct. Dec. 30, 2014).

81.     Because the monoline insurers' findings from loan level reviews set forth both in their breach notices and publicly available lawsuits reflected these common mortgage loan

Sponsors', Originators', and Sellers' systemic and pervasive violations of underwriting and securitization guidelines, U.S. Bank discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

82.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both the state and federal level, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties.  For example, the Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating effect on the performance of the Covered Trusts.  Many of the Certificates acquired by Western & Southern were triple-A or double-A rated at the time of purchase.  *See* Ex. D.  Now, many are "junk" bonds that do not qualify for any investment grade rating.  *See id.*  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines.  *See* Ex. E.  A summary of the Covered Trusts' high default and delinquency rates and enormous cumulative losses is attached as Exhibit E.  U.S. Bank was aware of the high level of defaults and should have carefully investigated these issues, notified certificateholders, including Western & Southern, of the issues, and taken action to address these issues.

83.     If U.S. Bank had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.  U.S. Bank had a continuing duty to provide such notice but

failed to do so throughout its tenure as trustee.  Indeed, U.S. Bank let the statute of

limitations to bring repurchase claims lapse by failing to provide notice or take other action

within six years of the closing of each Covered Trust.

**1.   The Originators' and Sponsors' Pervasive
Breaches of Representations and Warranties**

84.   Either the Sponsor or Originator, and sometimes both, provided

representations and warranties to the Covered Trusts.

85.   The failure of the parties to the PSAs to provide notice of breaches of

representations and warranties constituted a default that would have ripened into Events of

Default had U.S. Bank provided notice of the defaults.

86.   The chart below identifies each of the entities disclosed to be the Sponsors,

Originators, and obligors of the loans included in the Covered Trusts.

|   | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 1 | CMALT 2007-A7 | CitiMortgage, Inc. | CitiMortgage, Inc.; ABN AMRO Mortgage Group, Inc. | Citicorp Mortgage Securities, Inc. |
| 2 | CMLTI 2006-WF2 | Citigroup Global Markets Realty Corporation | Wells Fargo Bank, N.A. | Citigroup Global Markets Realty Corporation; Wells Fargo Bank, N.A.; Citigroup Mortgage Loan Trust, Inc. |
| 3 | CMSI 2006-5 | CitiMortgage, Inc. | CitiMortgage, Inc.; American Home Mortgage Corporation; SIRVA Mortgage, Inc. | Citicorp Mortgage Securities, Inc. |
| 4 | CSAB 2006-1 | DLJ Mortgage Capital, Inc. | Credit Suisse Financial Corporation; DLJ Mortgage Capital, Inc. | DLJ Mortgage Capital, Inc. |
| 5 | CSAB 2006-3 | DLJ Mortgage Capital, Inc. | Credit Suisse Financial Corporation; | DLJ Mortgage Capital, Inc. |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | DLJ Mortgage Capital, Inc. | |
| 6 | CSAB 2006-4 | DLJ Mortgage Capital, Inc. | Wells Fargo Bank, N.A.; Credit Suisse Financial Corporation; DLJ Mortgage Capital, Inc.; MortgageIT, Inc.; American Home Mortgage Corporation | DLJ Mortgage Capital, Inc. |
| 7 | CSMC 2007-1 | DLJ Mortgage Capital, Inc. | DLJ Mortgage Capital, Inc.; Credit Suisse Financial Corporation; IndyMac Bank, F.S.B.; GreenPoint Mortgage Funding, Inc. | DLJ Mortgage Capital, Inc.; GreenPoint Mortgage Funding, Inc. |
| 8 | GSR 2006-1F | Goldman Sachs Mortgage Company | Countrywide Home Loans, Inc.; IndyMac Bank, F.S.B. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing, LP; PHH Mortgage Corporation; IndyMac Bank, F.S.B.; GS Mortgage Securities Corporation; Goldman Sachs Mortgage Company |
| 9 | GSR 2007-1F | Goldman Sachs Mortgage Company | JPMorgan Chase Bank, N.A.; Wells Fargo Bank, N.A. | Goldman Sachs Mortgage Corporation; Goldman Sachs Mortgage Company; Bank of America, N.A.; JPMorgan Chase Bank, N.A.; Wells Fargo |

|    | Trust | Sponsor | Originators | Obligors |
|----|-------|---------|-------------|----------|
|    |       |         |             | Bank, N.A.; Avelo Mortgage, LLC |
| 10 | HEMT 2005-5 | DLJ Mortgage Capital, Inc. | Finance America | DLJ Mortgage Capital, Inc. |
| 11 | HEMT 2006-4 | DLJ Mortgage Capital, Inc. | Aames Capital Corporation; WMC Mortgage Corporation | DLJ Mortgage Capital, Inc. |
| 12 | HEMT 2006-5 | DLJ Mortgage Capital, Inc. | New Century Mortgage Corporation; DLJ Mortgage Capital, Inc. | DLJ Mortgage Capital, Inc. |
| 13 | JPMAC 2006-WF1 | J.P. Morgan Mortgage Acquisition Corporation | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A.; J.P. Morgan Mortgage Acquisition Corporation |
| 14 | TBW 2006-5 | Taylor, Bean & Whitaker Mortgage Corporation | Taylor, Bean & Whitaker Mortgage Corporation | BNP Paribas Mortgage Corporation |

87.     As detailed in Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.[4]

88.     The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to U.S. Bank that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain

---

[4] Based on the information currently known to Plaintiffs, the allegations and legal claims asserted in this document concern and are based exclusively on the inactions or failures to act by the loan originators and other persons and entities identified herein and their agents, employees and affiliates.

detailed information based on forensic reviews of individual loans.  Further, these lawsuits and

investigations demonstrate that the Originators originated mortgage loans with the goal of

increasing volume, rather than evaluating the borrower's ability to repay the loan, and regularly

made exceptions to underwriting guidelines in the absence of sufficient compensating factors.

89.     These lawsuits, in conjunction with the poor performance of the underlying loans

(which U.S. Bank was aware of as it issued regular reports regarding performance) and the

public information concerning widespread issues among Originators, were more than sufficient

to provide U.S. Bank with notice that large numbers of loans originated and sponsored by the

relevant Originators and Sponsors breached the associated representations and warranties.

90.     U.S. Bank was aware of these reports, investigations, and lawsuits, and it also had

additional information concerning representation and warranty violations that it learned in the

course of administering the Covered Trusts.  Additionally, U.S. Bank had access to non-public

information regarding the Covered Trusts that would have confirmed the representation and

warranty violations if it had conducted even a limited investigation.  Thus, U.S. Bank was aware

of the defaults, but failed to provide the required notice and pursue repurchase claims.

**B.     U.S. Bank Failed to Act Prudently
         Upon the Occurrence of an Event of Default**

91.     When U.S. Bank learned that the Master Servicers[5] or Servicers failed to

provide notice of numerous breaches of representation and warranty provisions as required

under the PSAs, U.S. Bank should have acted like a prudent person would in the exercise of

its own affairs and (i) taken action against the Master Servicers or Servicers; (ii) taken steps

to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified

---

[5] In the PSAs for the DLJ, Goldman Sachs, and JPMorgan Trusts, the Master Servicer was also the Securities
Administrator or Trust Administrator and was also required to provide notices of breaches by the Master Servicer
and Servicers.  References to the Master Servicer herein also refer to the Master Servicer as Securities Administrator
or Trust Administrator.

34

certificateholders of the Master Servicers' or Servicers' defaults and the breaches of representation and warranty provisions.  During the period that an Event of Default was in existence, U.S. Bank had a continuing duty to enforce repurchase rights.  As such, it should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party was required to repurchase such loans.  U.S. Bank continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

92.     Although certain Events of Default require formal notice and an opportunity to cure, the Trustee cannot escape its duty of care by failing to provide the required notice. As set forth in Section III(A), U.S. Bank was aware (or would have been aware if it had carried out its duties) that the Master Servicers, Servicers, Depositors, Sponsors, and the Trustee itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts.  U.S. Bank, however, did not provide notice of such breaches as it was required to do.  Because these would have seasoned into Events of Default if notice had been provided, U.S. Bank had a duty to act prudently to enforce repurchase provisions once it learned of such defaults.

93.     As described below, additional Events of Default occurred under the terms of the PSAs.  U.S. Bank has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1.     Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

94.     As discussed in Section II(A), U.S. Bank, or a custodian acting on its behalf, had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically includes

documents sufficient to prove ownership of the note and mortgage or otherwise protect title. U.S. Bank knew of numerous instances where it did not receive: (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

95.     When U.S. Bank prepared the final exception reports, it provided them to the Sponsors, Depositors, and Master Servicers (or Servicers) indicating many of these missing documents.  When the custodian prepared such reports, it provided them to U.S. Bank, the Sponsors, Depositors, and Master Servicers or (Servicers) and the reports similarly showed many documents that were required to be delivered under the PSAs were not delivered. U.S. Bank was aware that affected loans were not repurchased or substituted because the Trustee itself was required to take action each time a loan was substituted or repurchased. The PSAs for the DLJ, CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts provide that it was the Trustee's duty to seek cure, repurchase or substitution remedies and, as a result, U.S. Bank knew that affected loans were not cured, repurchased, or substituted because it did not seek such remedies.  *See* Ex. C § VI.

96.     Rather than take action to ensure the responsible parties cured such defects or substituted or repurchased the affected loans, U.S. Bank stood by while the Sponsors, Servicers, and Master Servicers of the Covered Trusts engaged in so called "robo-signing"

36

on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.  U.S. Bank and the Sponsors, Servicers, and Master Servicers of the Covered Trusts have been implicated in numerous governmental reports, court orders and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery failures and U.S. Bank's knowledge of such failures.  Section III(C) contains a chart of the relevant Sponsors, Servicers, and Master Servicers for the Covered Trusts.  U.S. Bank's and the relevant Sponsors', Servicers', and Master Servicers' involvement in the robo-signing scandal is summarized in Exhibit G.

97.    Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs.  These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

98.     First, each PSA provides that the Servicers' or Master Servicers' failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period after notice of such breach.  For example, Section 8.01 of the DLJ PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 60 days of notice of the breach.  The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain similar provisions.  *See* Ex. C § IX.

99.    Second, the PSA for the CMLTI 2006-WF2 Trust also provides that the Servicer's failure to perform its covenant to prudently service the mortgage loans ripens into

37

Case 1:16-cv-04569-WHP   Document 28-1   Filed 05/04/16   Page 42 of 61

a Servicer Event of Default if left uncured for a specified period after a servicing officer learns of such failure.

100.     As set forth above and in Exhibit G, when borrowers defaulted and the Servicers or Master Servicers were required to commence foreclosures, they fabricated the documents necessary to foreclose, rather than cause the Sponsor, Depositor, or Originator to repurchase or substitute the affected loan.  U.S. Bank was aware of this fact, as it was aware of the contents of the document exception reports and that loans with exceptions had defaulted and not been repurchased or substituted.  Both the Servicers and Trustee were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit G, the Servicers robo-signed the documentation required to foreclose.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent Servicer would have insisted that the loans be repurchased.  Having failed to provide notice, U.S. Bank had an obligation to act prudently to address all defaults.

101.     These Events of Default triggered U.S. Bank's duty to act prudently to protect the interests of the certificateholders in all respects, and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased.  U.S. Bank had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as Trustee, including as loans on the final exception report defaulted.  U.S. Bank also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred.  U.S. Bank has repeatedly breached these duties throughout its tenure as Trustee.

## 2.     U.S. Bank Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

38

102.    In addition to the Events of Default discussed above, on July 21, 2011, the

Association of Mortgage Investors ("AMI") notified all major RMBS trustees, (including U.S.

Bank) that "substantial evidence [] has emerged of abuses in the servicing and monitoring of"

RMBS.  The letter set forth in detail the publicly available evidence demonstrating that there was

widespread evidence, including some of the evidence referenced in this Complaint, that loan

Originators had systemically breached representations and warranties provided to securitization

trusts, and that the parties servicing loans underlying securitization trusts had systemically

breached their obligations under applicable servicing agreements.  The letter cautioned, "[y]ou

cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;"

"[u]pon discovery of representation or warranty breaches, you have to notify the appropriate

parties;" and "you must comply with your obligations . . . to take action to remedy the servicer

Events of Default in the best interests of the certificateholders."

103.    On April 7, 2014, a group of institutional investors announced an agreement

reached with Citigroup, Inc., under which Citigroup, Inc. made a binding offer to U.S. Bank to

settle mortgage repurchase claims related to a Covered Trust—CMLTI 2006-WF2.

Additionally, on or about December 16, 2011, a group of institutional investors purporting to

hold over 25% of the outstanding notes for the JPMorgan Trust, provided notice of numerous

defaults by the Servicer, Sponsor, and Originator, and requested that U.S. Bank open

investigations into ineligible mortgages in the pools securing the trust securitization.  U.S. Bank

determined it would enter into a settlement agreement with the institutional investors on behalf

of the JPMorgan Trust.

104.    To date, U.S. Bank has not exercised due care to ensure that the

certificateholders' interests are protected, and instead, agreed to settlements of repurchase

liabilities for the CMLTI 2006-WF2 Trust and JPMorgan Trust that are grossly inadequate.

105. Beginning in 2011, U.S. Bank commenced lawsuits relating to RMBS trusts other than the Covered Trusts against certain Sponsors and Originators (including DLJ Mortgage Capital Inc., Citigroup Global Markets Realty Corporation, Countrywide Home Loans, Inc., and GreenPoint Mortgage Funding, Inc.) alleging:

- the Originators sold a material number of loans to securitization trusts that did not comply with applicable underwriting guidelines in violation of their representations and warranties;

- the Servicers and Master Servicers failed to provide notice of each breach of a representation or warranty with respect to a mortgage loan; and

- the Master Servicer failed to use reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such of the mortgage loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.

*See, e.g.*, Am. Compl., *Citigroup Mortg. Loan Trust 2007-AMC3, by U.S. Bank Nat'l Ass'n v. Citigroup Global Mkts. Realty Corp.*, No. 13-cv-2843 (GBD) (S.D.N.Y. Nov. 21, 2014); Compl., *U.S. Bank Nat'l Ass'n v. Citigroup Global Mkts. Realty Corp.*, No. 13-cv-6989 (S.D.N.Y. Oct. 1, 2013); *Lehman XS Trust, Series 2006-4N, by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 13-cv-4707 (S.D.N.Y. July 8, 2013); Compl., *U.S. Bank Nat'l Ass'n v. Citigroup Global Mkts. Realty Corp.*, No. 653816/2013 (N.Y. Sup. Ct. Apr. 8, 2014); Compl., *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 652699/2012 (N.Y. Sup. Ct. Jan 6, 2014); Compl., *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 651954/2013 (N.Y. Sup. Ct. Nov. 6, 2013); Am. Compl., *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 651563/2013 (N.Y. Sup Ct. Aug. 28, 2013); Compl., *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 651174/2013 (N.Y. Sup. Ct. July 31, 2013); Compl., *Asset Backed Secs. Corp. Home Equity Loan Trust, Series AMQ 2006-7 (ABSHE 2006-HE7), by U.S. Bank Nat'l Ass'n v.*

*DLJ Mortg. Capital, Inc.*, No. 654146/2012 (N.Y. Sup. Ct. May 5, 2013); Compl., *U.S. Bank*

*Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011).

These lawsuits, which alleged pervasive and systemic breaches of representations and

warranties, demonstrate that U.S. Bank was aware of similarly pervasive and systemic breaches

of representations and warranties in the Covered Trusts, but failed to exercise due care.

### 3. Events of Default Concerning False Servicer Certifications

106. Each PSA obligated the Servicer to certify annually that it met its obligations

under the PSAs and applicable federal regulations.  For example, Section 8.02 of the DLJ PSA

requires the Master Servicer and each Servicer to certify, among other things,

> (A) a review of such party's activities during the preceding calendar year or portion thereof and of such party's performance under this Agreement, or such other applicable agreement in the case of an Additional Servicer, has been made under such officer's supervision and

> (B) to the best of such officer's knowledge, based on such review, such party has fulfilled all its obligations under this Agreement, or such other applicable agreement in the case of an Additional Servicer, in all material respects throughout such year or portion thereof, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

The PSAs for the CitiMortgage, Goldman Sachs, JPMorgan, and TBW Trusts contain

substantially similar requirements.  *See* Ex. C § XII.

107. The failure to provide a conforming certification is an Event of Default under

each of the PSAs.  *See* Ex. C §§ IX, XII.  Under the CMLTI 2006-WF2 PSA, an Event of

Default is also triggered by the breach without regard to whether or not notice is provided.

Under the remaining PSAs, an Event of Default is triggered if the Servicer or Master

Servicer fails to cure the breach within a designated period of time.

108.    U.S. Bank received certifications that it knew to be false because the Servicers were not in fact meeting their obligations under the PSAs and failed to disclose numerous representation and warranty violations.  As discussed in Sections III(B)(1) and III(D), the Servicers breached the PSAs in many ways including by attempting to foreclose on defective loans rather than tendering loans for repurchase or substitution and by looting trust assets through multiple servicing scams.  As discussed in Section III(A), U.S. Bank was aware of numerous representation and warranty violations that were not disclosed in the required servicing certifications.  U.S. Bank was aware of these breaches, and therefore, knew the required servicer certifications did not conform because they were false.  The PSAs only allowed the Trustee to rely upon the certifications if it had a good faith basis to believe the certifications were true.  Events of Default were triggered as a result, and U.S. Bank had a continuing duty to act prudently to protect the certificateholders' interests.

109.    In addition, under the DLJ, CitiMortgage, Goldman Sachs, JPMorgan, and TBW PSAs, the Servicers or Master Servicers provided a representation and warranty and covenant that all reports provided under the PSA, including servicing compliance certifications, were accurate and complete.  For example, Section 2.08(b) of the DLJ PSA provides: "No written information, certificate of an officer, statement furnished in writing or written report delivered to the Depositor, any affiliate of the Depositor, the Trustee or the Trust Administrator and prepared by the Master Servicer or such Servicer pursuant to this Agreement will contain any untrue statement of a material fact."  The PSAs for the CMALT 2007-A7; CMLTI 2006-WF; CSAB 2006-3; CSAB 2006-4; CSMC 2007-1; GSR 2006-1F; GSR 2007-1F; HEMT 2005-5; HEMPT 2006-4; HEMT 2006-5; JPMAC 2006-WF1, and TBW 2006-5 Trusts contain substantially similar provisions.

42

110.    The Trustee should have provided notice of breaches of representations and warranties or covenants resulting from the Servicers' or Master Servicers' false certifications.

### C.    U.S. Bank Failed to Address the Master Servicers' and Servicers' Looting of Trust Assets

111.    In addition to the servicing related defaults and Events of Default described above, the Servicers and Master Servicers have engaged in a variety of schemes to overcharge borrowers in default.  These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Western & Southern's losses.

112.    The chart below identifies each of the entities disclosed to be the Sponsors, Servicers, and Master Servicers of the loans included in the Covered Trusts.

|   | **Trust** | **Sponsor** | **Servicers** | **Master Servicer** |
|---|---|---|---|---|
| 1 | CMALT 2007-A7 | CitiMortgage, Inc. | CitiMortgage, Inc.; ABN AMRO Mortgage Group, Inc. | CitiMortgage, Inc. |
| 2 | CMLTI 2006-WF2 | Citigroup Global Markets Realty Corporation | Wells Fargo Bank, N.A. | |
| 3 | CMSI 2006-5 | CitiMortgage, Inc. | CitiMortgage, Inc. | CitiMortgage, Inc. |
| 4 | CSAB 2006-1 | DLJ Mortgage Capital, Inc. | Select Portfolio Servicing, Inc.; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 5 | CSAB 2006-3 | DLJ Mortgage Capital, Inc. | Wells Fargo Bank, N.A.; GreenPoint Mortgage Funding, Inc.; Select Portfolio Servicing, Inc.; IndyMac Bank, F.S.B.; SunTrust Mortgage, Inc.; Countrywide Home Loans Servicing LP; Chevy Chase Bank F.S.B.; Fifth Third Mortgage Company; HSBC Mortgage Corporation (USA) | Wells Fargo Bank, N.A. |

|  | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| 6 | CSAB 2006-4 | DLJ Mortgage Capital, Inc. | Wells Fargo Bank, N.A.; Select Portfolio Servicing, Inc.; Countrywide Home Loans Servicing LP | Wells Fargo Bank, N.A. |
| 7 | CSMC 2007-1 | DLJ Mortgage Capital, Inc. | IndyMac Bank, F.S.B.; Select Portfolio Servicing, Inc.; Wells Fargo Bank, N.A.; Banco Popular De Puerto Rico; GreenPoint Mortgage Funding, Inc. | Wells Fargo Bank, N.A. |
| 8 | GSR 2006-1F | Goldman Sachs Mortgage Company | Countrywide Home Loans Servicing, LP; IndyMac Bank, F.S.B.; PHH Mortgage Corporation | Wells Fargo Bank, N.A. |
| 9 | GSR 2007-1F | Goldman Sachs Mortgage Company | Avelo Mortgage, L.L.C.; JPMorgan Chase Bank, N.A.; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 10 | HEMT 2005-5 | DLJ Mortgage Capital, Inc. | Wilshire Credit Corporation; Ocwen Loan Servicing, LLC; Select Portfolio Servicing, Inc. | |
| 11 | HEMT 2006-4 | DLJ Mortgage Capital, Inc. | Select Portfolio Servicing, Inc.; Ocwen Loan Servicing, LLC | |
| 12 | HEMT 2006-5 | DLJ Mortgage Capital, Inc. | Select Portfolio Servicing, Inc.; Ocwen Loan Servicing, LLC | Select Portfolio Servicing, Inc. |
| 13 | JPMAC 2006-WF1 | J.P. Morgan Mortgage Acquisition Corporation | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 14 | TBW 2006-5 | Taylor, Bean & Whitaker Mortgage Corporation | Taylor, Bean & Whitaker Mortgage Corporation | Wells Fargo Bank, N.A. |

113.     From 2005 until today, the Servicers and Master Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including, without limitation, fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors, failing to adhere to industry benchmarks for foreclosure proceedings, and procuring insurance policies for properties that were already insured.

114.     When a defaulting borrower's home is foreclosed upon and sold, the Servicers and Master Servicers deduct their fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

115.     These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard and were not disclosed in annual certifications provided by the Master Servicers and Servicers.  As noted in Sections III(B)(1) and III(B)(3), servicing related defaults known to the Trustee triggered the Trustee's duty to act prudently.  U.S. Bank was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits, and press coverage, including articles in banking industry publications like the *American Banker*.

116.     Exhibit H summarizes servicing misconduct involving the relevant Servicers and Master Servicers.

## IV.     U.S. BANK SUFFERED FROM CONFLICTS OF INTEREST

117.     U.S. Bank failed and unreasonably refused to take action to protect the Covered Trusts and certificateholders against Originator breaches and Servicer violations

because it would have exposed that U.S. Bank was engaged in the same misconduct in its role as Servicer and Originator for other mortgages and RMBS trusts.

118.    During the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over U.S. Bank's foreclosure processes.  The reviews uncovered significant problems in U.S. Bank's foreclosure processing, including "critical weaknesses" in U.S. Bank's foreclosure practices and oversight of default services vendors.  *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_20110413.pdf.

119.    On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S. Bank, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.  According to the Federal Reserve Board press release, "These deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [US Bancorp]." The enforcement action required US Bancorp to improve its residential mortgage loan servicing and foreclosure practices.  As part of the enforcement action, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities."

120.    In addition, the Office of the Comptroller of the Currency entered into consent orders with U.S. Bank and several other servicers (the "OCC Consent Orders").  The OCC

Consent Order with U.S. Bank discussed how the two U.S. Bank branches located in Cincinnati, Ohio and Fargo, North Dakota were among the largest servicers of residential mortgages in the United States and serviced a portfolio of 1.4 million residential mortgage loans.  In the OCC Consent Order with U.S. Bank, the OCC found that there were "deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."  Further, U.S. Bank filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies and procedures, compliance risk management, internal audit, third-party management, and training for its foreclosure-related services.  *See In re U.S. Bank Nat'l Ass'n*, Consent Order, AA-EC-11-18 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47j.pdf.

121.    Because U.S. Bank was engaging in the same illicit and improper acts as the Servicers for the Covered Trusts, U.S. Bank failed to enforce the Servicer violations, or even alert the certificateholders to the Servicers' misconduct.

122.    U.S. Bank also acted as an Originator through its affiliates and sold loans to RMBS trusts, many of which materially breached representations and warranties. Accordingly, because U.S. Bank itself faced enormous repurchase liability for loans sold in breach of representations and warranties, U.S. Bank was disincentivized to take any action against the Originators, Sponsors, and Servicers for the Covered Trusts, or even alert the certificateholders to misconduct.

123.    Exhibits F, G, and H contain additional details concerning U.S. Bank's misconduct in servicing and originating residential mortgage loans.

**V.    U.S. BANK'S CONDUCT INJURED WESTERN & SOUTHERN**

124.    U.S. Bank's breaches of its contractual, statutory, and fiduciary duties have caused Western & Southern in excess of $100 million of damages.

125.    If U.S. Bank had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Western & Southern's losses.  And if U.S. Bank had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value as highly rated bonds with similar coupon rates are now trading at a very significant premium.

126.    U.S. Bank's failure to address the Master Servicers' and Servicers' failure to adhere to prudent servicing practices also increased the loss severities (i.e., the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property taxes and utility expenditures, which were borne by the Covered Trusts, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trusts and certificateholders.  The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

127.    If U.S. Bank had met its contractual, statutory, and fiduciary duties to accept delivery of notes and mortgage loan files, inspect them, give notice as required, and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Master Servicers, Servicers, Sponsors, Depositors, and Originators failed to deliver required documentation to the Trustee or breached

representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.  Moreover, U.S. Bank's failure to accept delivery of note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts, which has ultimately impacted the market value of the Certificates.  And U.S. Bank's failure to commence damages actions against the Master Servicers and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

128.    U.S. Bank's failure to meet its contractual, fiduciary, statutory, and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm.  If U.S. Bank had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans and required the Master Servicers and Servicers to replace the assets they have looted from the Covered Trusts.

129.    Many, if not all, of the repurchase or substitution claims described above have lapsed due to U.S. Bank's inaction as courts have held that the underlying representation and warranty claims that U.S. Bank failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitizations.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violations of the TIA)**

130.    Western & Southern repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

131.    The PSAs underlying and establishing the Covered Trusts are "indentures," and U.S. Bank is an "indenture trustee" under the TIA.  15 U.S.C. §  77aaa(7), (10).

132.    As a certificateholder, Western & Southern is a trust beneficiary entitled to the protections afforded under the TIA.

133.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. §  77ddd(a)(1).

134.    U.S. Bank violated the TIA in at least three ways.

135.    First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, U.S. Bank failed to carefully investigate serious, known issues with the loans in the Covered Trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

136.    Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above, U.S. Bank did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties, servicer defaults, and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

137.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  U.S. Bank has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which it failed to take action to correct.  In addition, U.S. Bank has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

138.    These breaches materially and adversely affected the interests of the certificateholders, including Western & Southern, because they resulted in the Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties.

139.    U.S. Bank is liable to Western & Southern for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

140.    Western & Southern repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

141.    The PSAs are valid and binding contracts entered into between U.S. Bank, each Covered Trust, the Sponsors, the Master Servicers, the Servicers, and the Depositors.

142.    The PSAs provide, among other things, the terms under which U.S. Bank acts as trustee for the Covered Trusts.

143.    As current holders of Certificates or Notes issued by each Covered Trust,

Western & Southern is an express, intended third-party beneficiary under the PSAs entitled to enforce the performance of the Trustee.

144. U.S. Bank breached several obligations that it undertook on behalf of Western & Southern as certificateholders including, without limitation, to:

(a) take steps to cause the Sponsors or Originators to repurchase loans eligible for repurchase;

(b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(d) provide notice of and take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e) enforce the repurchase obligations of the Sponsors and/or Originators.

145. The specific provisions breached by U.S. Bank are further detailed herein and in the attached Exhibits hereto.

146. U.S. Bank's breach of its duties set forth in the PSAs, as described above, caused Western & Southern's losses on their Certificates and diminished their value.

147. Western & Southern has performed its obligations under the PSAs.

148. U.S. Bank is liable to Western & Southern for the losses they suffered as a direct result of U.S. Bank's failure to perform its contractual obligations under the PSAs.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

149. Western & Southern repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

150.    As set forth in detail above, U.S. Bank owed certificateholders, including

Western & Southern, a duty to exercise all powers under the PSAs to act prudently to

protect certificateholders' rights once an Event of Default occurred or payments to

certificateholders became impaired.  This included, without limitation, duties to protect the

interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the

exercise of appropriate remedies following Events of Default, and enforce the repurchase

obligations of the Sponsors and/or Originators.

151.    As set forth in detail above, U.S. Bank breached its fiduciary obligations by

failing to perform these obligations and by failing to exercise due care and avoid conflicts of

interest.

152.    The violations by U.S. Bank of its fiduciary obligations impaired

certificateholders' ability to fully collect the principal and interest due on their Certificates

and caused losses in the value of Western & Southern's Certificates.

**FOURTH CAUSE OF ACTION**
**(Negligence—Failure to Avoid Conflicts of Interest and**
**Perform Ministerial Acts with Due Care)**

153.    Western & Southern repeats and realleges each and every allegation set forth

in the preceding paragraphs above as if fully set forth herein.

154.    U.S. Bank owed certificateholders, including Western & Southern, extra-

contractual duties to perform ministerial acts with due care and avoid conflicts of interests.

As described above, U.S. Bank performed or failed to perform its responsibilities in a

grossly inadequate and negligent manner.

155.    U.S. Bank's negligence and gross negligence impaired certificateholders'

ability to fully collect the principal and interest due on their Certificates and caused losses in

the value of Western & Southern's Certificates.

## FIFTH CAUSE OF ACTION
### (Violation of the Streit Act)

156.     Western & Southern repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

157.     As certificateholders, Western & Southern is a trust beneficiary entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

158.     The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

159.     The PSAs underlying and establishing the Covered Trusts are "indentures," and U.S. Bank is a "trustee" under the Streit Act.  N.Y. Real Prop. Law § 125(3).

160.     Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

161.     As set forth above, U.S. Bank failed to exercise its rights under the PSAs after becoming aware of "events of default" by failing to:

> (a) protect the interests of the beneficiaries of the Covered Trusts;
>
> (b) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;
>
> (c) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such

representations and warranties;

(d) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(e) provide notice of and take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(f) enforce the repurchase obligations of the Sponsors and/or Originators.

162.    U.S. Bank is liable to Western & Southern for damages incurred as a result of its violations of the Streit Act.

## SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)

163.    Western & Southern repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

164.    At all relevant times, U.S. Bank owed Western & Southern, as an express, intended third-party beneficiary under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required U.S. Bank to ensure that it did not, by act or omission, injure the rights of Western & Southern to receive the benefits and protections provided for under the PSAs.

165.    By the conduct described above, U.S. Bank breached its duty of good faith and fair dealing under the PSAs.

166.    U.S. Bank's breaches are material.

167.    As a result of these breaches, Western & Southern has suffered damages and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Western & Southern prays for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Western

& Southern against U.S. Bank for breaches of its statutory, contractual, and fiduciary duties, its gross negligence, ordinary negligence, and negligent misrepresentations, in an amount to be proven at trial, including interest thereon;

      B.    Awarding Western & Southern its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      C.    Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

      Western & Southern hereby demand a trial by jury on all issues triable by jury.

January 12, 2016                  Respectfully submitted,

/s/ Jean Geoppinger McCoy
David P. Kamp (0020665)
Jean Geoppinger McCoy (0046881)
WHITE, GETGEY & MEYER COMPANY, LPA
One W. Fourth Street, Suite 1700
Cincinnati, Ohio 45202
dkamp@wgmlpa.com
jmccoy@wgmlpa.com
 (513) 241-3685

David H. Wollmuth (*Pro Hac Vice* Pending)
Steven S. Fitzgerald (*Pro Hac Vice* Pending)
Ryan A. Kane (*Pro Hac Vice* Pending)
Roselind F. Hallinan (*Pro Hac Vice* Pending)
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
rhallinan@wmd-law.com
(212) 382-3300

*Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading was served upon:

>Brian D. Wright, Esq.
>Stephen A. Weigand, Esq.
>FARUKI IRELAND & COX, P.L.L.
>201 East Fifth Street, Suite 1420
>Cincinnati, Ohio  45202
>bwright@ficlaw.com
>sweigand@ficlaw.com

>and

>David F. Adler, Esq.
>Louis A. Chaiten, Esq.
>Shimshon Balanson, Esq.
>JONES DAY
>901 Lakeside Avenue
>Cleveland, Ohio  44114
>dfadler@jonesday.com
>lachaiten@jonesday.com
>sbalanson@jonesday.com

by electronic mail, this 12th day of January, 2016.

>/s/ Jean Geoppinger McCoy
>Jean Geoppinger McCoy