UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ :
COMMERZBANK AG,                            :
                                           :            16cv4569
                              Plaintiff,   :
                                           :        OPINION & ORDER
            -against-                       :
                                           :
U.S. BANK NATIONAL ASSOCIATION.,           :
  *et al.*,                                 :
                                           :
                              Defendants.   :
------------------------------------------ :

WILLIAM H. PAULEY III, United States District Judge:

              Defendants U.S. Bank National Association and Bank of America National

Association move to dismiss Commerzbank AG's claims.  For the reasons that follow,

Defendants' motion is granted in part and denied in part.

BACKGROUND

              This action arises from the sale of residential mortgage backed securities

("RMBS").  RMBS are abstruse financial products that were integral in the rapid rise and

precipitous fall of the U.S. housing market during the aughts.  The collapse of the housing

bubble sent the economy into a tailspin, and spawned a series of investigations into the mortgage

industry that unearthed a litany of abuses—deficient underwriting standards, subprime lending,

and coercive foreclosure practices, to name a few.

              These discoveries ushered in a new era of mega cases.  And over the past decade,

RMBS litigation has been a lot like musical chairs—virtually every party in the securitization

process has sued or been sued by a counterparty in an unending game of blame shifting.  The

latest permutation involves claims against RMBS trustees.  Commerzbank, an investor in 57

trusts, sues the RMBS trustees here—U.S. Bank and Bank of America (the "Trustees")—on the theory that they had a duty to monitor, notify, and take action against the mortgage originator, sponsor, and servicer for any breaches committed under the governing trust documents.

I.    The Securitization Process

An RMBS is the product of a complex process called mortgage loan securitization. The process begins when a lender (or multiple lenders) issues mortgages (the "Originator"), and sells them to another financial institution (the "Seller" or "Sponsor"). The Sponsor then pools and transfers these mortgages to an affiliated special purpose vehicle (the "Depositor"). The Depositor subsequently conveys the bundled mortgages to a trust managed by a trustee, where they are prioritized into tranches of entitlements to payments from the borrowers. Each tranche in the loan securitization reflects a different level of risk and reward.

The trust issues certificates (i.e., RMBS) representing those tranches to underwriters, who then market and sell the certificates to investors like Commerzbank. The certificateholder may pay more or less for a certificate depending on the level of risk and reward associated with each tranche. Because the certificates are secured by the mortgages held in trust, their expected rate of return hinges on the performance of the loans and the borrowers' ability to repay.

The trust is governed by a document called the Pooling and Servicing Agreement ("PSA"). Under the PSA, a servicer is appointed to manage the collection of payments on the mortgage loans (the "Servicer"). The Servicer's responsibilities consist of monitoring delinquent borrowers, foreclosing on defaulted loans, checking compliance with representations and warranties in the loans, tracking mortgage documentation, and managing and selling foreclosed properties. (Complaint ("Compl."), ECF No. 1, ¶ 31.)

II.    Trustees' Duties

The PSA enumerates the Trustees' duties and obligations.  Those duties are bifurcated into pre-Event of Default ("pre-EOD") and post-Event of Default ("post-EOD") duties.

A.    Pre-EOD Duties

Prior to an Event of Default, the Trustee must receive a complete set of files associated with each mortgage in the trust.  Because physical possession of the mortgage documents is necessary to transfer ownership rights to the mortgage loans from the Sponsors and Depositors to the trusts, the Trustee must review the file for each mortgage and certify that the loan documentation is accurate and complete.  (Compl. ¶ 43.)  After a designated period, the Trustee must provide a final certification and document exception report identifying any missing documents required by the PSA.  (Compl. ¶ 46.)  If the mortgage file has any defects, the Trustee and the Servicer must demand that the Sponsor cure the defect (within a prescribed period), or repurchase or substitute the defective loan.  (Compl. ¶ 47.)

The Trustee also has a duty to notify all parties of a Sponsor or Originator's breach of any representations and warranties that the loans complied with applicable origination guidelines.  (Compl. ¶¶ 49, 69.)  A breach of representations and warranties arises, for example, when the Sponsor or Originator disregards its underwriting guidelines and issues loans to borrowers who lack the ability to repay.  (Compl. ¶ 78.)  If the Trustee discovers a breach, it must provide notice and force the Sponsor or Originator to repurchase or replace the defective loan.  (Compl. ¶ 93.)

Finally, the Trustee has a duty to provide notice of a Servicer's breach and initiate corrective action.  (Compl. ¶¶ 50, 59.)  A servicing breach can arise, for example, when the

Servicer fails to provide notice of a breach of representations and warranties (Compl. ¶ 101), or improperly forecloses on a defaulted mortgage using false documents.  (Compl. ¶ 106.)

### B.  Event of Default

While many of the PSAs at issue in this action have varying definitions of what constitutes an Event of Default, it generally arises when the Servicer materially breaches a servicing duty, a designated party provides written notice of the breach to the Servicer, and the Servicer fails to cure within a specified period of time.[1]

### C.  Post-EOD Duties

Post-EOD duties arise after an Event of Default has occurred.  The Trustee must "exercise such of the rights and powers vested in it by th[e] [PSA], and use the same degree of care and skill in [its] exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."  (See, e.g., Compl., Ex. C, § VII, Barclays PSA, § 8.01.)  This duty is owed to all certificateholders.

## DISCUSSION

### I.  Statute of Limitations

The Trustees seek to dismiss a number of claims on the basis that they are barred by the various statutes of limitations.  At issue are (1) all tort claims as to thirty certificates sold before December 28, 2012; (2) all contract claims as to fifteen certificates sold before December 31, 2011; (3) all Streit Act claims; (4) all claims against Bank of America as to seven certificates (and tort claims as to two more certificates); and (5) all claims against U.S. Bank as to one particular certificate.  (Defendants' Joint Motion to Dismiss ("MTD"), ECF No. 89, at 37–38.)

---

[1]  In 27 of the trusts, an Event of Default occurs after a Servicer's failure to cure following a fixed period measured from when the Servicer had actual knowledge of its breach.  And in 30 of the trusts, the Servicer's cure period runs from the date that written notice of its breach was provided.  (Compl., Ex. C, § IX.)

Essentially, the Trustees contend that these claims were filed more than a decade after many of the trusts were closed, and at least five years after the details relating to the alleged misconduct emerged.

Generally, a federal court sitting in diversity must apply the forum state's statute of limitations and any other provisions governing the tolling of the limitations period. Diffley v. Allied-Signal, Inc., 921 F.2d 421, 423 (2d Cir. 1990). But "when a case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court must apply the choice-of-law rules that the transferor court would have applied." Mopex, Inc. v. Am. Stock Exch., LLC, 2002 WL 342522, at *4 (S.D.N.Y. Mar. 5, 2002) (citing Van Dusen v. Barrack, 376 U.S. 612 (1964)); Berger v. Cushman & Wakefield of Penn., Inc., 2013 WL 4565256, at *12 n.6 (S.D.N.Y. Aug. 28, 2013). The exception to this rule is that "[w]hen the action could not have been maintained in the transferor court, the applicable law, including choice of law rules, is the state law of the transferee court." Mopex, 2002 WL 342522, at *4. This exception applies most commonly "where the transferor court lacked personal jurisdiction over the defendant." Mopex, 2002 WL 342522, at *5.

Here, the Southern District of Ohio transferred this action pursuant to § 1404(a), explaining that transfer would "promote efficiencies through the potential for coordinated schedules and discovery among the parties, witnesses, and judges in [the Southern District of New York]." Commerzbank AG v. U.S. Bank N.A., 2016 WL 3255071, at *5 (S.D. Ohio June 14, 2016). Thus, Ohio's statute of limitations and choice-of-law rules apply unless the Ohio court lacked jurisdiction over the Trustees.

As a resident of Ohio, U.S. Bank is subject to the Ohio court's general jurisdiction. Thus, Commerzbank's claims against U.S. Bank under Ohio's applicable

limitations period—based on the date the Trustees contend these claims began to accrue—are timely. See Fordham Fin. Serv., Inc. v. Ventramex S.A. De C.V., 137 F. Supp. 3d 1023, 1027 (S.D. Ohio 2015) (eight years for breach of contract); Chateau Estate Homes, LLC v. Fifth Third Bank, 2017 WL 3207085, at *2 (Ohio Ct. App. July 28, 2017) (four years for negligence and breach of fiduciary claims).

Moreover, although Bank of America is not a resident of Ohio, the causes of action asserted here arise from it or its agents transacting business in Ohio. (Compl. ¶¶ 26–27.) Bank of America's activities in relation to the trusts here—many of which were backed by loans made to borrowers in Ohio—constitute purposeful minimum contacts with Ohio and comport with notions of fair play and substantial justice. See Norvel Ltd. v. Ulstein Propeller AS, 161 F. Supp. 2d 190, 203–04 (S.D.N.Y. 2001); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). Notably, Ohio courts in other cases have exercised jurisdiction over nonresident defendants in similar actions based on their activities in Ohio as RMBS trustees. See W. & S. Life Ins. Co. v. Deutsche Bank Nat'l Tr. Co., 2015 WL 9998236, at *4–16 (Ohio Ct. Com. Pl. Nov. 5, 2016); W. & S. Life Ins. Co. v. Bank of N.Y. Mellon, No. A1302490 (Ohio Ct. Com. Pl. June 23, 2014).

The Trustees' argument that Ohio law does not govern the statute of limitations confuses the basis for the Ohio court's transfer order with the prerequisites for personal jurisdiction. In the transfer order, the Ohio court relied on convenience to the parties and witnesses as well as the interests of justice in deciding to transfer this action to New York. The Ohio court's decision was entirely discretionary. That analysis is not dispositive of the Ohio court's authority to exercise personal jurisdiction had it chosen to retain this action.

But even if this Court credited the Trustees' position that New York's borrowing statute under CPLR § 202 applies, substantially all of the claims here, at least on this motion to dismiss, would be considered timely. Because the claims arise from an economic injury, they are deemed to accrue in Germany—the place of injury. Germany's statute of limitations begins to run when the plaintiff has knowledge of the facts giving rise to the claim, but that is inherently a factual inquiry that cannot be determined on a motion to dismiss. HSN Nordbank AG v. RBS Holdings USA Inc., 2015 WL 1307189, at *6 (S.D.N.Y. Mar. 23, 2015) ("Limitations-based arguments in RMBS fraud actions have not generally been accepted at the motion to dismiss phase."). At the pleading stage, this Court cannot determine whether Commerzbank had sufficient knowledge of each element of its claims with respect to any of the trusts at issue here. BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A. ("BlackRock Series S"), 2017 WL 1194683, at *33 (S.D.N.Y. Mar. 30, 2017); Commerzbank AG v. Deutsche Bank Nat'l Tr. Co., 234 F. Supp. 3d 462, 473 (S.D.N.Y. 2017); Commerzbank AG v. Bank of N.Y. Mellon ("Commerzbank/BONY"), 2017 WL 1157278, at *3 (S.D.N.Y. Mar. 21, 2017).

## II. Breach of Contract Claims

### A. Post-EOD Duty

#### i. Event of Default

The Trustees contend that Commerzbank's post-EOD duty claims fail to allege that an Event of Default occurred. Under many of the PSAs, an Event of Default arises when three things happen: (1) a material breach by the Servicer; (2) notice to the Servicer of the breach; and (3) the Servicer's failure to cure the breach within a designated period. (See Affidavit of Jacob Kreilkamp in Support of Motion to Dismiss ("Kreilkamp Aff."), ECF No. 90, Ex. E (PSA Chart—Event of Default).) According to the Trustees, Commerzbank's failure to

plead notice to the Servicer or the Servicer's failure to cure—both of which must occur before an Event of Default—is fatal to its post-EOD duty claims.  (MTD at 10–12.)

The prevention doctrine, however, provides that "a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party [it]self."  <u>Bank of N.Y. v. Tyco Int'l Grp., S.A.</u>, 545 F. Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008).  Here, allegations regarding the Trustees' notice of breach and the Servicers' failure to cure are absent from the Complaint because the Trustees did nothing despite allegedly knowing—or having reason to know—about a number of breaches.  Thus, Commerzbank argues that the Trustees may not rely on their failure to give notice to prevent an Event of Default from occurring.  (Plaintiff's Opposition to Motion to Dismiss ("Opp."), ECF No. 96, at 15.)

While several courts in this District have applied the prevention doctrine to cases in which a Trustee failed to plead notice and cure, the Trustees nonetheless invoke a New York state appellate court decision, <u>Commerce Bank v. Bank of N.Y. Mellon</u>, 141 A.D.3d 413 (App. Div. 2016) ("<u>Commerce Bank II</u>"), to buttress their argument that the prevention doctrine is inapplicable.  But <u>Commerce Bank II</u> says nothing about the prevention doctrine.  There, the First Department affirmed the dismissal of a breach of contract claim, reasoning that a single letter informing the defendant of events "that, with time, <u>might</u> ripen into events of default" was insufficient to establish defendant's knowledge and trigger the duty to provide notice.  <u>Commerce II</u>, 141 A.D.3d at 415 (emphasis added).  Thus, the facts in <u>Commerce II</u> are readily distinguishable from the allegations in this action.

Moreover, <u>Commerce Bank II</u>'s holding does not conflict with what other judges in this District have concluded—that the Trustee "cannot rely on its own failure to give notice to escape its own liability."  <u>Okla. Police Pension & Ret. Sys. v. U.S. Bank N.A.</u>, 291 F.R.D. 47, 70

(S.D.N.Y. 2013), <u>abrogated on other grounds by</u> <u>Ret. Bd. of the Policemen's Annuity & Ben.</u> <u>Fund of the City of Chi. v. Bank of N.Y. Mellon ("PABF/BONY")</u>, 775 F.3d 154 (2d Cir. 2014). This is exactly what the Trustees seek to do here—evade blame on the basis that other deal parties could have provided notice. But relevant here is that the Trustees, by virtue of their knowledge, <u>could have</u> notified the Servicers. Having failed to do so, they may not now seek refuge in that failure. <u>Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co. ("Phoenix</u> <u>Light/Deutsche Bank")</u>, 172 F. Supp. 3d 700, 715 n.5 (S.D.N.Y. 2016) (even without an affirmative or "contractual requirement to give notice, the prevention doctrine would apply to a party who insists on the performance of a condition precedent when the non-performance is caused by the party itself."). Simply put, the Trustees "took no steps to fulfill the condition, though [they] had the power and . . . the knowledge to do so." <u>Royal Park Invs. SA/NV v.</u> <u>HSBC Bank USA, N.A. ("Royal Park/HSBC")</u>, 109 F. Supp. 3d 587, 605 (S.D.N.Y. 2015).

Nor does <u>Commerce II</u> jettison the Trustee's duty to "nose to the source" under appropriate circumstances. Generally, a trustee's duty to provide notice of a breach does not by itself create an implied duty to monitor the Servicer and other deal parties, or put a "nose to the source" of possible breaches prior to an Event of Default. Consistent with that general proposition, <u>Commerce Bank II</u> sensibly held that an RMBS trustee does not have a "duty to monitor or a duty to 'nose to the source' of improper servicing," if there is no reason to know about it. 141 A.D. 3d at 416. But where, as here, the Complaint alleges a number of circumstances plausibly raising an inference that the Trustees knew, or should have known, of a breach, the duty to monitor arises. Thus, while "[l]earning of facts merely suggestive of a breach would not require the Trustee[s] to immediately raise a claim, <u>upon receipt of such notice</u>, it becomes incumbent upon the Trustee[s] to pick up the scent and nose to the source." <u>BlackRock</u>

Series S, 2017 WL 1194683, at *10 (citing Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of Am., N.A., 907 F. Supp. 2d 536, 553 (S.D.N.Y. 2012)) (emphasis original).

> ii. Servicer Breaches

The Trustees further contend that allegations of generalized problems in the servicing industry and public letters or reports citing servicing failures are insufficient to show that Servicer breaches actually occurred in connection with the 57 trusts here.  But the Complaint plausibly alleges a number of facts that, on a motion to dismiss, are sufficient to raise the inference that the Servicers breached their duties in the course of servicing the trusts.

The Complaint is replete with allegations regarding the Trustees' knowledge of Servicer breaches.  When the Trustees commenced repurchase actions against Sponsors and Originators for issuing loans that did not comply with their underwriting guidelines, the Servicers allegedly failed to provide notice.  They also failed to use reasonable efforts to foreclose on properties subject to defaulted mortgages.  (Compl. ¶ 80.)

Further, the Trustees allegedly identified a number of omissions and defects in document exception reports, yet did nothing to correct them.  Instead, they stood by "while the Sponsors and Servicers engaged in so-called 'robo-signing' on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts." (Compl. ¶ 106.)  And the Trustees were allegedly aware of these breaches because "numerous governmental reports, court orders, and press reports regarding servicing misconduct" were in the public eye.  (Compl. ¶ 106.)  The Complaint alludes to the "massive cover-up of the failure to deliver documentation . . . known as the 'robo-signing' scandal" as "powerful evidence of the systemic document delivery failures and [the Trustees'] knowledge of such failures."  (Compl. ¶ 106.)

The Complaint also identifies multiple instances of servicing misconduct in connection with defaulted loans. The Trustees allegedly knew that Servicers commenced foreclosures by "fabricat[ing] the documents necessary to foreclose rather than cause the Sponsor, Depositor, or Originator to repurchase or substitute the affected loan." (Compl. ¶ 110.) The Trustees were also aware that Servicers "engaged in a variety of schemes to overcharge borrowers in default," imposing improper and excessive fees, failing to oversee third-party vendors, flouting industry benchmarks for foreclosure proceedings, and procuring insurance policies for properties that were already insured. (Compl. ¶¶ 120, 122.) These allegations suffice at this stage to marshal Commerzbank's claims forward. See Royal Park Inv. SA/NV v. Bank of N.Y. Mellon ("Royal Park/BONY"), 2016 WL 899320, at *6 (S.D.N.Y. Mar. 2, 2016).

### iii. Actual Knowledge or Receipt of Written Notice of Event of Default

The Trustees maintain that the Complaint fails to allege that they actually knew, or received written notice, of an Event of Default. (MTD at 17–20.) Unlike Commerce Bank II, where notice and discovery of breaches were not alleged, the Trustees here knew about the abuses attendant to the mortgage servicing industry, the countless government investigations into servicing and underwriting practices, and the specific foreclosure or repurchase proceedings in which they were named as plaintiffs. And Commerzbank plausibly connects these allegations to draw a reasonable inference that the Trustees had actual knowledge of an Event of Default.

The Complaint also sufficiently establishes that the Trustees received notice of an Event of Default. Unlike Commerce Bank II, where a non-party's letter informing defendants of the possibility of an Event of Default fell short of establishing notice and knowledge, the Complaint's allegations here are far more robust. One letter, sent by the Association of Mortgage Investors, detailed a bevy of abuses in the mortgage servicing industry and warned the

Trustees that they "cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral." (Compl. ¶ 112.) Two other letters, sent by investors in trusts over which the Trustees served the same role, provided notice of relevant facts regarding numerous defaults by servicers, sponsors, and originators, among other things. (Compl. ¶ 113–114.)

The Trustees' "attempt to apply a heightened pleading standard to allegations concerning actual knowledge is inappropriate at this stage." Royal Park/BONY, 2016 WL 899320, at *6. The sum of Commerzbank's allegations, construed in a light most favorable to Plaintiffs, plausibly support the notion that the Trustees were "on notice of so many deficiencies surrounding the mortgages—including missing paperwork, underwriting failures, and other seller breaches—that [they] surely would have conducted a minimal, albeit (perhaps) not contractually required, investigation that would have unearthed the Servicer misconduct" imbuing them with the notice and knowledge of a Servicer Event of Default. Phoenix Light SF Ltd. v. Bank of N.Y. Mellon ("Phoenix Light/BONY"), 2015 WL 5710645, at *4–5 (S.D.N.Y. Sept. 29, 2015); Royal Park/BONY, 2016 WL 899320, at *6 (allegations regarding news reports, governmental investigations, trustees' involvement in many foreclosure actions and bankruptcy proceedings, and widespread delinquencies and staggering losses suffered by the trusts at issue plausibly establish actual knowledge of events of default).

B. Pre-EOD Duty

Commerzbank's pre-EOD claims are predicated on the Trustees' alleged failure to take action against Sponsors or Originators upon discovering breaches of representations and warranties in the underlying loans. The Trustees counter that the Complaint fails to allege "that [they] received written notice of, had actual knowledge of, or discovered (depending on the PSA) specific breaches as to specific loans." (MTD at 21 (emphasis original).)

The Trustees' insistence that the Complaint must allege their knowledge of "any specific breaches as to any specific loans" has been roundly rejected by other courts in this District. (Defendants' Reply in Support of Motion to Dismiss, ECF No. 98, at 10.) While Commerzbank must ultimately show breaches of representations and warranties on a loan-by-loan and trust-by-trust basis to prevail on its claims, it "cannot be required to identify breaches . . . with respect to the individual loans in the specific trusts [as] such information, at this stage, is uniquely in the possession of defendants." Fixed Income Shares: Series M v. Citibank N.A., 130 F. Supp. 3d 842, 853 (S.D.N.Y. 2015); Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Tr. Co. ("Royal Park/Deutsche Bank"), 2016 WL 439020, at *6 (S.D.N.Y. Feb. 3, 2016). Commerzbank need only plead "factual content that allows the court to draw the reasonable inference" that the Sponsors and Originators breached their representations and warranties with respect to the trusts at issue. Fixed Income Shares, 130 F. Supp. 3d at 854. And here, Commerzbank satisfies its pleading burden with allegations "rais[ing] a reasonable expectation that discovery will reveal evidence proving [its] claim." Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of Am., N.A., 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013), abrogated on other grounds PABF BONY, 775 F.3d 154.

Here, the Complaint alleges enough to show that the Trustees were involved in foreclosure proceedings as named plaintiffs for defaulted loans that were originated by the very same Sponsors and Originators in the trusts here. (Compl. ¶¶ 74–78.) As real parties in interest, the Trustees are presumed to have reviewed the contents of the foreclosure filings, which revealed that the borrowers never should have received their loans in the first place or that these loans violated state and federal law. (Compl. ¶ 78.) Moreover, the Trustees allegedly commenced repurchase actions against the same Originators and Sponsors in the trusts here after

discovering that they had systematically breached representations and warranties of loans in other trusts. (Compl. ¶¶ 80–82.) Based on these allegations, the Trustees at the very least should have been prompted to look more closely at the loans underlying the trusts here.

The Trustees also received notice from monoline insurers tasked with providing credit enhancement to cover any losses on defaulted loans. In view of the myriad breaches of representations and warranties, the insurers themselves filed lawsuits against the same Sponsors and Originators. Those lawsuits provided a detailed forensic review of each loan's deficiencies. (Compl. ¶¶ 84–92.)

And finally, the Complaint alleges that the Trustees had actionable intelligence that the Sponsors and Originators breached their representations and warranties as to the specific loans in the trusts based on their poor performance. While many of the certificates backed by these loans were assigned triple-A or double-A ratings based on the Sponsor or Originator's representations, the alarming rate of default or delinquency should have alerted the Trustees about the bona fides of the ratings. (Compl. ¶ 92.)

These allegations, though generalized to the industry, are nevertheless specific enough to establish that the Trustees had sufficient knowledge to act. Of course, it also helps that the "RMBS context provides a rather unusual set of circumstances in which there has been significant litigation and investigations into the practices—broadly construed—of a variety of actors, and findings made" such that Commerzbank "may ride the coattails of some of this work." Blackrock Core Bond Portfolio v. U.S. Bank N.A., 165 F. Supp. 3d 80, 100 (S.D.N.Y. 2016). But "[d]own the road, at trial, they will be put to their proof. At that point, relying on wrongs elsewhere demonstrated would be insufficient." Blackrock Core, 165 F. Supp. 3d at 100.

For now, Commerzbank "is not required to plead the specific actual knowledge of a defendant with respect to the particular deficiencies of a particular loan." Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 713. Commerzbank's "detailed allegations of high default rates, staggering economic losses, and widespread investigation into RMBS securitization are sufficient to allow the court to draw the reasonable inference that [representations and warranties] were breached on a loan-by-loan basis." Royal Park/Deutsche Bank, 2016 WL 439020, at *6 (original alterations omitted). The breadth of misconduct, recklessness, and oversight in the RMBS industry at the time these loans were originated and sold makes it "implausible to assume that somehow all the mortgage loans underlying the [trusts in this action] miraculously avoided the pervasive practices of the industry at the time." Fixed Income Shares, 130 F. Supp. 3d at 854.

C.  No-Action Clauses

As to 17 of the Trusts, the Trustees contend that no-action clauses in the PSAs preclude Commerzbank's claims. Those clauses limit legal action arising from the PSA to situations in which a plaintiff "provides written notice of an EOD to a specified party, assembles the support of a specified percentage of other certificateholders, demands that a specified deal party initiate the suit, and offers indemnification for that suit." (MTD at 27.) Absent such a demand, the Trustees argue that claims as to 17 trusts must fail.

Generally, no-action clauses may not be construed to bar investor claims against an RMBS trustee because it would be "absurd to require the debenture holders to ask the trustee to sue itself." Cruden v. Bank of New York, 957 F.2d 961, 968 (2d Cir. 1992); see also Royal Park/HSBC, 109 F. Supp. 3d at 614. But here, the no-action clauses as to the 17 trusts do not require a demand on the trustee—rather, they require a party to approach the Servicers in their

capacity as trust administrators or securities administrators.  (Kreilkamp Aff., Ex. I.)
Commerzbank counters that for "fifteen of the seventeen trusts it would be equally absurd to
make a demand on the Servicer to sue the trustee for failing to take action against the Servicer,"
and for the other two trusts, that asking "Bank of New York . . . [as trust administrator] . . .
would be equally futile because it would likely shed light on [its] own misconduct as it was
engaged in the same misconduct as a trustee and faced the same liability as Defendants."  (Opp.
at 24–25.)

   Commerzbank seeks to underscore the futility of making a pre-suit demand on
parties whose interests are aligned with the Trustees' or whose alleged misconduct would be
exposed as a result of suing the Trustee.  But that argument "essentially expand[s] the exception
recognized by Cruden for suits brought against the trustee into one that swallows a no-action
clause as a whole."  Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp.
2d 162, 187 (S.D.N.Y. 2011).  Commerzbank's argument might have legs had it sued the
Trustees and the Servicers, but this lawsuit seeks relief solely from the Trustees.  Despite
whatever liability the Servicers had—including the misdeeds described in the Complaint—
Commerzbank did not sue them.  There is "an important difference between asking the trustee to
sue itself—an 'absurd' requirement [the Court] presume[s] the parties did not intend"—and
asking a third party to sue the trustee, even if the investor alleges wrongdoing by that third party.
Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc., 2010 WL 3324705, at *6 (N.D. Ill. Aug.
20, 2010); Ellington, 837 F. Supp. 2d at 187; see also Sterling Fed. Bank, F.S.B. v. Bank of N.Y.
Mellon, 2012 WL 3101699, at *2 (N.D. Ill. July 30, 2012) (rejecting the argument that trustees
are categorically exempt from no-action clauses, and that "there is nothing 'absurd' about asking
[the Trust Administrator] to sue [the Trustee].").

Moreover, no-action clauses are strictly construed in New York.  Cruden, 957

F.2d at 968.  Because the trust administrators and the securities administrators are not the

Trustees, Commerzbank was required to make a demand on them to initiate suit despite whatever

incentive they may have had to stall litigation.  Cruden cannot be used as a catch-all to save

Commerzbank from its failure to do that.  Thus, Commerzbank's claims as to the 17 trusts

subject to these no-action clauses are dismissed.

III.    Tort Claims

A.  Application of the Economic Loss Rule

U.S. Bank seeks to dismiss Commerzbank's tort claims on grounds that they are

foreclosed by the economic loss rule.  This doctrine holds that "a tort action for economic loss

will not lie" where the parties' relationship is governed by an express contract.  BNP Paribas

Mortg. Corp. v. Bank of Am., N.A., 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013).  A "contracting

party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use

of familiar tort language in its pleadings."  Phoenix Light SF Ltd. v. U.S. Bank N.A. ("Phoenix

Light/US Bank"), 2016 WL 1169515, at *9 (S.D.N.Y. Mar. 22, 2016).  The economic loss rule,

however, does not apply in "cases involving liability for the violation of a professional duty."

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 18 (2d Cir. 2000).

"Courts in this District have split with regard to the application of the economic-

loss doctrine to tort claims brought against an RMBS trustee."  Blackrock Series S, 2017 WL

1194638, at *15.  In determining whether the rule applies, the dispositive question is whether

Commerzbank "allege[s] damages that flow from the violation of a professional duty, or merely

from the violation of the governing agreements[.]"  BlackRock Series S, 2017 WL 1194683, at

*15.  If the Complaint asserts extra-contractual duties, the tort claims may survive.  Additionally,

17

damages for those torts must exist independent of any damages arising from the breach of contract claim.

Here, the Complaint alleges that the Trustees breached a "non-waivable duty to exercise due care in the performance of ministerial acts required . . . in the course of the administration of the trust." (Compl. ¶ 67.) "Under New York law, an indenture trustee owes a duty to perform its ministerial functions with due care, and if this duty is breached the trustee will be subjected to tort liability." Black Rock Series S, 2017 WL 1194683, at *13 (citing Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 717). Moreover, Commerzbank alleges that the Trustees owe "an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors," that arose "independently of the PSAs." (Compl. ¶ 68.) In the post-EOD context, the Complaint alleges that the Trustees had a special duty of undivided loyalty to secure trust assets for trust beneficiaries. (Compl. ¶¶ 126–137.) These extra-contractual allegations suffice at this stage to foreclose the application of the economic loss rule. BlackRock Series S, 2017 WL 1194683, at *15; Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 718–19 ("The dispositive issue is whether [the Trustee] owed duties to the plaintiffs that were separate from the duties set forth in the PSAs and the Indenture Agreements."); Royal Park/Deutsche Bank, 2016 WL 439020, at *9 (allowing tort claims to proceed where alleged duty was extra-contractual). Accordingly, the Trustees' motion to dismiss the tort claims under the economic loss rule is denied.

B. Breach of Fiduciary Duty

The Trustees argue that Commerzbank's breach of fiduciary duty claims are duplicative of its breach of contract claims. But Commerzbank's breach of fiduciary duty claims extend to "acts that are outside the scope of contractual duties after an Event of Default."

Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 719 (citing Phoenix Light/BONY, 2015 WL 5710645, at *7); Royal Park/HSBC, 109 F. Supp. 3d at 609. On the occurrence of an Event of Default, the Trustees allegedly violated their duty of loyalty to Commerzbank and other investors—they were compromised by conflicts of interest that disincentivized them from taking any actions adverse to the interests they shared with Servicers. (Compl. ¶¶ 7, 13, 35, 126–137.) These fiduciary duties exist separate and apart from the post-EOD duties memorialized in the PSAs, and "fidelity to the terms of [the PSA] does not immunize [the Trustees] against claims that [they] acted in a manner inconsistent with [their] fiduciary duty of undivided loyalty to trust beneficiaries." BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011). Therefore, the Trustees' motion to dismiss the breach of fiduciary duty claims is denied.

C. Negligence or Gross Negligence Claims—Conflicts of Interest and Performance of Ministerial Acts with Due Care

Commerzbank's negligence and gross negligence claims are based on alleged breaches of two extra-contractual pre-EOD duties: (1) to avoid conflicts of interest and (2) to perform ministerial tasks with due care.

As an initial matter, the Trustees argue that Commerzbank's claims as to four trusts governed by Delaware law must fail because the parties are free to "expand, restrict, or eliminate whatever preexisting duties there might be." (MTD at 30 (citing Cargill, Inc. v. JWH Special Circumstance LLC, 959 A.2d 1096, 1112 (Del. Ch. 2008)).) But the PSAs "do not appear to restrict actions alleging that the Trustee[s] [are] liable for negligence in performing extra-contractual duties." Phoenix Light/Deutsche Bank, 172 F. Supp. 3d at 720 (citing Phoenix Light/BONY, 2015 WL 5710645, at *8; Fixed Income Shares, 130 F. Supp. 3d at 857–58). Rather, they provide that none of their provisions should be construed to relieve a Trustee from

liability "for its own negligent action, its own negligent failure to act or its own willful misconduct." (See, e.g., Compl., Ex. C, § VII.) The PSAs acknowledge the possibility of claims arising from extra-contractual duties.

For the remaining trusts, Commerzbank's tort claims arise out of a separate, extra-contractual duty whose "breach may subject the [Trustees] to tort liability." Ellington, 837 F. Supp. 2d at 192; see also Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 552 (N.Y. 1992). Here, the Trustees "had an independent duty to perform [their] nondiscretionary ministerial duties with due care and to avoid conflicts of interest" in addition to their post-EOD fiduciary duty. Royal Park/HSBC, 109 F. Supp. 3d at 609 n.127 (citing Ellington, 837 F. Supp. 2d at 191)). It is "irrelevant that [Commerzbank] claim[s] that while violating these duties, [the Trustees] were also breaching the contracts. The fiduciary duties were independently created by New York courts for fear that 'broad exculpatory provisions' would excuse indenture trustees from operating in the best interest of the certificateholders." Royal Park/HSBC, 109 F. Supp. 3d at 609 n.127 (emphasis original).

Commerzbank frames the relationship between the Trustees and Servicers as riddled with financial conflicts of interest. (See Compl. ¶¶ 126–137.) In essence, the Trustees "failed to enforce representations and warranties claims or declare Events of Default out of fear of disrupting existing business relationships with counterparties." Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon, 180 F. Supp. 3d 246, 261 (S.D.N.Y. 2016); Commerzbank/BONY, 2017 WL 1157278, at *6 (Trustee "failed to take action against Sellers and Servicers because it would reveal that it was an active participant in various servicing related misconduct and imperiled lucrative business relationships."). Those allegations are sufficient to sustain Commerzbank's negligence and gross negligence claims on a motion to dismiss.

IV.     Breach of Covenant of Good Faith and Fair Dealing Claims

Courts "regularly dismiss any freestanding claim for breach of the covenant of fair dealing where the claims derive from the same set of facts" as a breach of contract claim. Ret. Bd. of Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y. Mellon, 2014 WL 3858469, at *3 (S.D.N.Y. July 30, 2014); Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). This claim may be maintained along with a breach of contract claim "only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract." Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp. 2000 WL 335557, at *8 (S.D.N.Y. Mar. 30, 2000).

Commerzbank's breach of the implied covenant of good faith and fair dealing claims fail for two reasons. First, "[e]very contract is assumed to incorporate a covenant of good faith and fair dealing unless such obligation is expressly disclaimed." Phoenix Light/U.S. Bank, 2016 WL 1169515, at *10 (emphasis added). The PSAs expressly disclaim implied covenants. (See, e.g., Kreilkamp Aff., Ex. B, ABSHE 2006–HE5 PSA § 8.01 ("[N]o implied covenants or obligations shall be read into this Agreement against the Trustee.").) Thus, any claims arising from PSAs containing this express disclaimer are dismissed.

To the extent that certain PSAs do not expressly disclaim the implied covenant, they are nevertheless duplicative of the breach of contract claim. The Complaint alleges that Defendants "owed Commerzbank, as an express, intended third-party beneficiary under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required Defendants to ensure that they did not, by act or omission, injure the rights of Commerzbank to receive the benefits and protections provided for under the PSAs." (Compl. ¶ 180.) This allegation alone—which stems from the same facts as the breach of contract claim—is fatal to Commerzbank's

implied covenant claim.  BlackRock Series S, 2017 WL 1194683, at *15; Commerzbank AG v.

HSBC Bank USA ("Commerzbank/HSBC"), 2016 WL 3211978, at *3–4 (S.D.N.Y. June 8,

2016).

V.    Streit Act Claim

The Streit Act "regulates all mortgage investments where the properties are

located in the state, the trustee does business with respect to the investments in New York, or the

trustee is authorized to do business in New York."  Phoenix Light/Deutsche Bank, 172 F. Supp.

3d at 722 (citing N.Y. Real Prop. Law § 124.)  Commerzbank claims that U.S. Bank violated the

Streit Act when it failed to exercise its post-EOD duties under the PSA, such as enforcing the

repurchase obligations of the Sponsors and/or Originators, notifying all parties to the PSAs of

breaches of representations and warranties relating to the mortgage loans, and generally

protecting the interests of the trust beneficiaries.  (Compl. ¶ 177.)  But these duties are inherent

to the PSAs, and the Streit Act does not independently create other, similar duties.  Section

126(1) of the Streit Act states, in relevant part:

> No trustee shall hereafter accept a trust under any trust indenture or
> mortgage within the contemplation of this article . . . unless the
> instrument creating the trust shall contain the following provisions,
> among others, which confer the following powers and impose the
> following duties upon the trustees . . . 1.  In the case of an event of
> default (as such term is defined in such instrument), to exercise such
> of the rights and powers vested in the trustee by such instrument,
> and to use the same degree of care and skill in their exercise as a
> prudent man would exercise or use under the circumstances in the
> conduct of his own affairs.

N.Y. Real Prop. Law § 126(1).  The "plain language of Section 126 is clear; it requires only that

trust instruments include certain provisions, and does not itself impose any affirmative duties on

trustees."  Commerzbank/HSBC, 2016 WL 3211978, at *2; Phoenix Light/Deutsche Bank, 172

F. Supp. 3d at 723 (the Streit Act "does not create any additional duties for trustees beyond the

duties in the PSAs, and only requires that certain types of provisions be included in the indenture agreement"). Given that the PSAs at issue contain provisions requiring a trustee to exercise its rights and powers prudently in the case of an Event of Default, there is no violation of the Streit Act. Accordingly, the Streit Act claims are dismissed.

VI.     Trust Indenture Act Claim

The Trust Indenture Act ("TIA") provides that instruments to which it applies must be issued under an indenture that has been "qualified" by the Securities and Exchange Commission. It however, "applies only to certain kinds of instruments, which are defined by the statute's list of exemptions; in other words, only instruments that do not fall within at least one of these exemptions are subject to the TIA." PABF/BONY, 775 F.3d at 164 (emphasis original). In PABF/BONY, the Second Circuit held that the TIA does not "impose obligations on the trustees of RMBS trusts governed by pooling and servicing agreements." PABF/BONY, 775 F.3d at 155; Phoenix Light/BONY, 2015 WL 5710645, at *9. Accordingly, the TIA claims are dismissed.

## CONCLUSION

For the foregoing reasons, the Trustees' motion to dismiss is granted as to the Breach of the Implied Covenant of Good Faith and Fair Dealing claims, the Streit Act claims, the Trust Indenture Act claims, and claims arising from the 17 trusts subject to a no-action clause. The Trustees' motion to dismiss is denied as to the Breach of Contract claims, the Breach of Fiduciary Duty claims, and the Negligence claims. The Clerk of Court is directed to terminate the motion pending at ECF No. 89.

Dated:  September 27, 2017
        New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.