UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  :

COMMERZBANK AG,                                  :
                                                 :
                        Plaintiff,               :
                                                 :        16cv4569
        -against-                                :
                                                 :        OPINION & ORDER
U.S. BANK NATIONAL ASSOCIATION,                  :
                                                 :
                        Defendant.               :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  :

WILLIAM H. PAULEY III, Senior United States District Judge:

           Defendant U.S. Bank National Association ("U.S. Bank") moves for summary judgment dismissing Plaintiff Commerzbank AG's claims.  (ECF No. 293.)  Due to the complexity of this case, the number of claims, and the demanding summary judgment standard, the parties submitted lengthy statements of undisputed facts in support of their respective positions.  To characterize them as sprawling would be an understatement.  Almost every statement of undisputed fact is controverted at least in part by the opposing party.  The result is a staggering 1,274 pages of factual assertions supported by 1,049 exhibits.  By this Court's reckoning, the parties utilized more than 430,000 words in their respective statements of undisputed facts, a word count longer than Margaret Mitchell's epic novel Gone with the Wind. For the reasons that follow, U.S. Bank's motion is granted in part and denied in part.

BACKGROUND

           This Court assumes familiarity with its prior Opinion & Order and summarizes only the facts necessary to decide this motion.  See Commerzbank AG v. U.S. Bank Nat'l Ass'n., 277 F. Supp. 3d 483 (S.D.N.Y. 2017).

1

I.       Residential Mortgage-Backed Securities, Generally

This action arises from the sale of residential mortgage-backed securities ("RMBS").  RMBS are abstruse financial products that were integral to the rapid rise and precipitous fall of the U.S. housing market over a decade ago.  The collapse of the housing bubble propelled the economy into a tailspin and destroyed the value of RMBS and related securities.  This in turn spawned a series of investigations into the mortgage industry that unearthed a litany of abuses—deficient underwriting standards, questionable subprime lending practices, and coercive foreclosure practices, to name a few.

The ensuing financial crisis spawned a plethora of civil actions over the past decade.  RMBS litigation has been a lot like musical chairs—virtually every party in the securitization process has sued or been sued by a counterparty in an unending game of blame shifting.  The latest permutation involves claims against RMBS trustees.  Here, Commerzbank, an investor in 56 trusts,[1] sues the RMBS trustees—U.S. Bank and Bank of America—on the theory that they had a duty to monitor, notify, and take action against the mortgage originators, sponsors, and servicers for any breaches committed under the governing trust documents.

RMBS are the product of a complex process called mortgage loan securitization.  The process begins when a lender (or multiple lenders) issues mortgages (the "Originator") and sells them to another financial institution (the "Seller" or "Sponsor").  The Sponsor then pools

---

[1]        Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE1; ABSHE 2006-HE5; BSABS 2005-EC1; BSABS 2005-HE10; BSABS 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; BSARM 2006-2; CHASE 2006-A1; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-AR7; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-AR1; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; CSAB 2006-4; FFMER 2007-2; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; GSAMP 2006-HE6; HEAT 2005-2; HEAT 2005-4; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; JPALT 2006-A6; JPALT 2007-S1; JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1; JPMAC 2006-CH2; JPMAC 2006-CW2; JPMAC 2006-NC2; MABS 2005-FRE1; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; MARM 2007-HF2; MLMI 2006-AHL1; MSM 2006-15XS; SABR 2006-WM1; SURF 2007-BC1; WAMU 2007-OA2; WAMU 2007-OA6; WMALT 2007-OA2; and WMALT 2007-OC1.

and transfers these mortgages to an affiliated special purpose vehicle (the "Depositor"). The Depositor subsequently conveys the bundled mortgages to a trust managed by a trustee (the "Trustee"), where they are prioritized into tranches. Each tranche in the loan securitization in theory reflects a different level of risk.

The trust issues certificates (i.e., RMBS) representing those tranches to underwriters, who then market and sell the certificates to investors like Commerzbank. The certificateholder may pay more or less for a certificate depending on the perceived level of risk associated with each tranche. Because the certificates are secured by the mortgages held in trust, their expected rate of return hinges on the performance of the loans, which is in turn dependent on the borrowers' ability to repay.

The trusts are governed by a document called the Pooling and Servicing Agreement ("PSA"). Under each PSA, a servicer (the "Servicer") is appointed to manage the collection of payments on the mortgage loans. The Servicer's responsibilities consist of monitoring delinquent borrowers, checking compliance with representations and warranties in the loans, tracking mortgage documentation, foreclosing on defaulted loans, and managing selling foreclosed properties.

The PSAs enumerate the Trustees' duties and obligations. Those duties are bifurcated into pre-Event of Default ("pre-EOD") and post-Event of Default ("post-EOD") duties.

II.    Pre-Event of Default Duties

Prior to an Event of Default ("EOD"), the Trustee must receive a complete set of files associated with each mortgage in the trust. Because physical possession of the mortgage documents is necessary to transfer ownership rights of the mortgage loans from the Sponsors and

Depositors to the trusts, the Trustee must review the file for each mortgage and certify that the loan documentation is accurate and complete.  After a designated period, the Trustee must provide a final certification and document exception report identifying any missing documents required by the PSA.  If the mortgage file has any defects, the Trustee and the Servicer must demand that the Sponsor cure the defect within a prescribed period, or repurchase or substitute the defective loan.

III.   Event of Default

While many of the PSAs at issue in this action vary over what constitutes an EOD, such events generally arise when the Servicer materially breaches a servicing duty, a designated party provides written notice of the breach to the Servicer or the Servicer has actual knowledge of a breach, and the Servicer fails to cure within a specified period of time.

IV.   Post-Event of Default Duties

Post-EOD duties arise after an EOD has occurred.  Then, the Trustee is obligated to demand breaching deal party cure.  The PSAs require the Trustee to exercise its rights and powers with the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.  This duty is owed to all certificateholders such as Commerzbank.

V.   Motion to Dismiss

On November 9, 2016, U.S. Bank and Bank of America jointly moved to dismiss the Complaint.  (ECF No. 89.)  This Court granted U.S. Bank and Bank of America's motion as to the breach of the implied covenant of good faith and fair dealing claims, the Streit Act claims, the Trust Indenture Act claims, and claims arising from the 17 trusts[2] containing no-action

---

[2]   Those trusts are CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-WFHE1; CMLTI 2007-

clauses.  Commerzbank, 277 F. Supp. 3d at 499–500.  This Court denied the motion as to the breach of contract claims arising from both pre- and post-EOD duties, the breach of fiduciary duty claims, and the negligence claims.  Commerzbank, 277 F. Supp. 3d at 500.

VI.   Bank of America

On December 11, 2019, Commerzbank and Bank of America agreed to settle their claims.  (ECF No. 365.)  That agreement came after Bank of America fully briefed its motion for summary judgment but before oral argument.  On February 19, 2020, Commerzbank voluntarily dismissed Bank of America as a defendant with prejudice.  (ECF No. 386.)  The dismissal of Bank of America does not whittle down any of the claims in this action against U.S. Bank.  That is because Bank of America sold all 13 trusts[3] for which it was the original Trustee to U.S. Bank between 2008 and 2010.  (U.S. Bank's Reply and Resp. to Commerzbank's Counter-Statement of Undisputed Facts Pursuant to Local Rule 56.1, ECF No. 347 ("U.S. Bank 56.1"), ¶ 3.)

DISCUSSION

I.   Legal Standard

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Baez v. JetBlue Airways Corp., 793 F.3d 269, 274 (2d Cir. 2015) (quotation marks omitted).  This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

---

WFHE2; CSAB 2006-4; JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1; JPMAC 2006-CH2; JPMAC 2006-CW2; JPMAC 2006-NC2; and MARM 2007-HF2.

[3]        Those trusts are BSABS 2005-EC1; BSABS 2005-HE10; BSABS 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; FFMER 2007-2; GSAMP 2006-HE5; MLMI 2006-AHL1; MSM 2006-15XS; WAMU 2007-OA2; WAMU 2007-OA6; WMALT 2007-OA2; and WMALT 2007-OC1.

<u>Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.</u>, 444 F.3d 158, 162 (2d Cir. 2006) (quoting

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

        "The party seeking summary judgment bears the burden of establishing that no

genuine issue of material fact exists . . . ." <u>Rodriguez v. City of New York</u>, 72 F.3d 1051, 1060–

61 (2d Cir. 1995).  If the moving party meets its burden, "the adverse party must set forth

specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250

(quotation marks omitted); <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment," as "conclusory allegations or denials cannot by themselves create a

genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d

159, 166 (2d Cir. 2010) (citation and alterations omitted).  "In determining whether a genuine

issue of material fact exists, a court must resolve all ambiguities and draw all reasonable

inferences against the moving party." <u>Flanigan v. Gen. Elec. Co.</u>, 242 F.3d 78, 83 (2d Cir.

2001).

        In the RMBS context, plaintiffs may rely on allegations that are "generalized to

the industry" to deflect a motion to dismiss. <u>Commerzbank</u>, 277 F. Supp. 3d at 495.  However,

at summary judgment, Commerzbank must show evidence on a "trust-by-trust basis to prevail on

its claims." <u>Commerzbank</u>, 277 F. Supp. 3d at 494; <u>see also</u> <u>Phoenix Light SF Ltd. v. Bank of

N.Y. Mellon</u>, 2017 WL 3973951, at *8 (S.D.N.Y. Sept. 7, 2017) ("Although <u>Retirement Board</u>

arose in the context of determining class standing, the Second Circuit nevertheless made clear

that to prevail on the merits of their RMBS claims, the plaintiffs cannot rely on generalized

proof; rather, the plaintiffs must prove their claims that the Trustee breached its contractual

obligations 'loan-by-loan and trust-by-trust.'" (quoting <u>Ret. Bd. of the Policemen's Annuity &

<u>Ben. Fund of the City of Chicago v. Bank of New York Mellon</u>, 775 F.3d 154, 162 (2d Cir. 2014)).

II.    <u>Standing</u>

U.S. Bank moves for summary judgment on all of Commerzbank's claims arising from certificates Commerzbank no longer owns.[4]  U.S. Bank contends Commerzbank now lacks standing.  This Court agrees.

A.    <u>Sold Certificates</u>

The first group of certificates are ones that Commerzbank sold to third parties.[5]  Commerzbank does not dispute that it sold these certificates.  However, Commerzbank contends that when the Sold Certificates were transferred, Commerzbank retained rights to the claims for breaches that occurred while it held the Sold Certificates.  Whether Commerzbank retains the rights to those claims turns on which jurisdiction's law applies to the transfer.

1.    <u>Choice of Law</u>

The parties first dispute which jurisdiction's law would apply to determine whether Commerzbank has maintained the legal right to the claims arising from the Sold

---

[4]        Those certificates are ABSHE 2005-HE8, M5; BSABS 2005-HE10, M3; BSABS 2005-HE4, M5; BSABS 2005-HE7, M3; BSABS 2005-HE9, M4; BSARM 2006-2, 3A3; CMLTI 2005-10, 1A34; CMLTI 2005-HE3, M5; CMLTI 2005-HE3, M6; CMLTI 2006-AR7, 1A3B; CMLTI 2006-WFHE2, M3; CMLTI 2006-WFHE2, M5 Palmer; CMLTI 2006-WFHE3, M6 Palmer; CMLTI 2006-WFHE4, M1; CMLTI 2007-WFHE2, M3; CSAB 2006-4, A6A; FFMER 2007-2, A2D; HEAT 2005-2, B1; HEAT 2005-4, B1; HEAT 2005-4, M7; HEAT 2005-9, M2; JPALT 2006-A6, 2A4; JPALT 2006-A6, 2A8; JPMAC 2005-WMC1, M5; JPMAC 2005-WMC1, M6; JPMAC 2006-CW2, MV3; MABS 2006-AM2, A4; MABS 2006-AM3, A4; MARM 2007-HF2, A2; MSM 2006-15XS, A3; SABR 2006-WM1, A2C; and WMALT 2007-OC1, A1.

[5]        Those certificates are ABSHE 2005-HE8, M5; BSABS 2005-HE10, M3; BSABS 2005-HE4, M5; BSABS 2005-HE7, M3; BSABS 2005-HE9, M4; BSARM 2006-2, 3A3; CMLTI 2005-HE3, M5; CMLTI 2005-HE3, M6; CMLTI 2006-WFHE2, M3; CMLTI 2006-WFHE2, M5 Palmer; CMLTI 2006-WFHE3, M6 Palmer; CMLTI 2006-WFHE4, M1; CMLTI 2007-WFHE2, M3; CSAB 2006-4, A6A; FFMER 2007-2, A2D; HEAT 2005-2, B1; HEAT 2005-4, B1; HEAT 2005-4, M7; HEAT 2005-9, M2; JPALT 2006-A6, 2A4; JPALT 2006-A6, 2A8; JPMAC 2005-WMC1, M5; JPMAC 2005-WMC1, M6; JPMAC 2006-CW2, MV3; MABS 2006-AM2, A4; MABS 2006-AM3, A4; MARM 2007-HF2, A2; MSM 2006-15XS, A3; SABR 2006-WM1, A2C; and WMALT 2007-OC1, A1 (collectively, the "Sold Certificates").

Certificates.  Generally, "federal courts sitting in diversity generally apply the law of the state in which they sit."  Gerena v. Korb, 617 F.3d 197, 204 (2d Cir. 2010).  But "when a case is transferred for convenience under 28 U.S.C. § 1404(a), the law of the transferor state is to be applied so long as the transferor state could properly have exercised jurisdiction."  Gerena, 617 F.3d at 204.  This case was transferred from the Southern District of Ohio and that district had jurisdiction over this action.  See Commerzbank, 277 F. Supp. 3d at 490.  Accordingly, this Court will utilize Ohio's choice of law framework.

Ohio's choice of law analysis applies "the two-step approach set forth in the Restatement (Second) of Conflict of Laws."  Premium Freight Mgmt., LLC v. PM Engineered Sols., Inc., 906 F.3d 403, 406 (6th Cir. 2018).

The first step is to determine whether there is a conflict of law.  Commerzbank argues that because the Sold Certificates were sold through Commerzbank's London branch, the transfers should be governed by English law.  U.S. Bank contends that the transactions actually occurred at the Depository Trust Company ("DTC")—a clearing house that held and transferred the Sold Certificates—which is a New York entity governed by New York law.  Because Commerzbank contends that English law provides standing and U.S. Bank counters that New York law extinguishes all these claims, this Court finds a conflict of law exists.

The second step is to determine the jurisdiction with the most significant relationship to the claims.  The factors courts consider when determining which jurisdiction has the most significant relationship are: "(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of 1 Restatement (Second) of Conflict of Laws

10]." Morgan v. Biro Mfg. Co., 474 N.E.2d 286, 289 (Ohio 1984).[6]  "Generally, Ohio follows

the rule that where a conflict of law issue arises in a case involving a contract, the law of the

state where the contract is to be performed governs."  Gries Sports Enter., Inc. v. Modell, 473

N.E.2d 807, 810 (Ohio 1984) (quotation marks omitted).

       Commerzbank argues that the transactions took place in England because the

certificates were sold from Commerzbank's London branch to purchasers in London.  The fact

that these certificates were sold out of Commerzbank's London branch is not compelling.

Indeed, courts in this district have rejected the concept that branches of a bank are separate

entities.  See, e.g., HSH Nordbank AG v. RBS Holdings USA Inc., 2015 WL 1307189, at *5

(S.D.N.Y. Mar. 23, 2015) ("[I]t is well established that a branch or agency of a bank is not a

separate entity." (quotation marks omitted)); Deutsche Zentral-Genossenchaftsbank AG v.

HSBC N. Am. Holdings, Inc., 2013 WL 6667601, at *6 (S.D.N.Y. Dec. 17, 2013) (same).

       More to the point, the actual transactions did not occur in London; they occurred

in New York through DTC, a clearing house.  (See Decl. of Michael T. Marcucci in Supp. of

U.S. Bank's Mot. for Summ. J., ECF Nos. 298, 350 ("Marcucci Decl."), Ex. 46; U.S. Bank 56.1

¶ 65.)  As Custodian, DTC legally transfers the assets from one certificateholder to another under

DTC's own roof.  (U.S. Bank 56.1 ¶ 60.)  Indeed, a Commerzbank employee described DTC's

involvement in the sale process as "actually mov[ing] the assets from a custodial perspective,

because the assets are actually stored at a custodian."  (Marcucci Ex. 49, at 7.)  In order to

purchase or sell through DTC, participants must enter into agreements with DTC.  (U.S. Bank

---

[6]     Section 6 of 1 Restatement (Second) of Conflict of Laws 10, provides the following factors: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of law to be applied."

56.1 ¶ 61.)  Every contract with DTC includes a provision that New York law governs the agreement.  (U.S. Bank 56.1 ¶ 61.)  The publicly available DTC rules provide that all agreements are governed and construed in accord with New York law.  (U.S. Bank 56.1 ¶¶ 61–63.)  Commerzbank attempts to dismiss the DTC process as "ministerial."  However, this Court is not persuaded.  See Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC, 2015 WL 139731, at *10 (Del. Ch. Jan. 12, 2015) (finding that New York had the most significant relationship in part because "the physical location of the Certificates at the Depository Trust Company [was] located in New York").  The fact that DTC actually holds the certificates and effectuates the transactions means that the transactions actually occurred in New York and are governed by New York law.

### 2. Standing under New York Law

Under New York law, claims travel with the security unless expressly reserved in writing.  See N.Y. Gen. Oblig. Law § 13-107; see also Royal Park Inv. SA/NV v. HSBC Bank USA, N.A., 2018 WL 679495, at *4 (S.D.N.Y. Feb. 1, 2018) ("[T]he New York General Obligations Law provides that '[u]nless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist . . . for damages against the trustee or depository under any indenture under which such bond was issued.'" (quoting N.Y. Gen. Oblig. Law § 13-107(1) (second alteration in original))).

Commerzbank does not dispute that when the certificates were sold, Commerzbank did not expressly reserve any claims.  Since Commerzbank no longer retains the claims under the Sold Certificates, it lacks standing to sue on them.

B.  <u>Duke Repo Certificates</u>

   The parties dispute whether an additional tranche of certificates was sold.[7]  In

November 2007, these seven certificates were sold through a tri-party repo transaction.  The

transaction is diagramed below:



(Marcucci Decl. Ex. 39, at 7.)  In this transaction, Dresdner Bank London Branch—a

Commerzbank entity—transferred the Duke Repo certificates to Dresdner Kleinwort Securities

LLC—also a Commerzbank entity.  Dresdner Kleinnwort Securities LLC then transferred the

certificates to unnamed third parties, merely diagramed as the "Street," which presumably relates

to other financial institutions.  The parties have not identified to whom the certificates were

transferred.

   Commerzbank does not dispute that this tri-party repo transaction occurred.  (<u>See</u>

Decl. of Robert Boelstler in Opp. of U.S. Bank's Mot. for Summ. J., ECF No. 327 ("Boelstler

Decl."), ¶ 12.)  While U.S. Bank offers evidence that the Duke Repo Certificates were

transferred away, Commerzbank contends that this was an internal arrangement designed to

---

[7]    Those certificates are BSARM 2006-2, A3A; CMLTI 2005-10, 1A34; CMLTI 2006-AR7, 1A3B; JPALT
2006-A6, 2A8; MABS 2006-AM2, A4; MABS 2006-AM3, A4; and SABR 2006-WM1, A2C (collectively, the
"Duke Repo Certificates").  It is worth noting that there is significant overlap between the Duke Repo Certificates
and the Sold Certificates.  Indeed, only CMLTI 2005-10, 1A34 and CMLTI 2006-AR7, 1A3B are Duke Repo
Certificates that are not Sold Certificates.

improve the rate of return and that the certificates were transferred back to Commerzbank.  In support of this assertion, Commerzbank points to a spreadsheet which it claims demonstrates the Duke Repo Certificates were in fact transferred back to Commerzbank.  (Decl. of Ryan A. Kane in Opp. of U.S. Bank's Mot. for Summ. J., ECF No. 328 ("Kane Decl."), Ex. 129.)  But that spreadsheet is undated.  Accordingly, this Court cannot discern if this spreadsheet shows that Commerzbank held the Duke Repo Certificates before or after the execution of the tri-party repo transaction.  Therefore, this Court finds that Commerzbank lacks standing as to the Duke Repo Certificates.

III.    Timeliness

        Since the 2008 financial crisis, courts—especially in this district—have been inundated with RMBS litigation.  But in recent years, the statute of limitations has begun to extinguish claims.  U.S. Bank argues that substantially all of Commerzbank's claims are untimely.  As with standing, this Court begins with a choice of law analysis to determine which statute of limitations applies.

        A.    Choice of Law

        As previously discussed, since this case was transferred from the Southern District of Ohio, Ohio's statute of limitations applies.  Diffley v. Allied-Signal, Inc., 921 F.2d 421, 423 (2d Cir. 1990).

        1.    Ohio's Statute of Limitations

        Ohio's statute of limitations for breach of fiduciary duty and negligence claims is four years from "the time the wrongful act [was] committed."  Union Sav. Bank v. Lawyers Title Ins. Co., 946 N.E.2d 835, 842 (Ohio 2010).  Since Commerzbank initially brought this suit on December 28, 2015, (ECF No. 1), any of the surviving tort claims which accrued before

December 28, 2011 would be untimely under Ohio's statute of limitations.  Ohio's statute of limitations for contract claims is significantly longer, with actions being timely if filed within eight years of the cause of action accruing.  Ohio Rev. Code Ann. § 2305.06.  Therefore, any contract claims are timely if they accrued on or after December 28, 2007.

2. Ohio's Borrowing Statute

However, Ohio has a borrowing statute, which requires claims to be timely under both Ohio's statute of limitations and the jurisdiction where the claims accrued.  Ohio Rev. Code Ann. § 2305.03(B).  To determine the jurisdiction in which Commerzbank's claims arose, Ohio courts look to "where the plaintiff resides and sustains the economic impact of the loss."  Taylor v. First Resolution Invest. Corp., 72 N.E.3d 573, 587 (Ohio 2016) (quotation marks omitted).

Commerzbank argues that since it purchased and held the certificates in its London office, this Court should apply the English statute of limitations to their claims.  But again, Commerzbank's London branch is not a separate entity.  Instead, Commerzbank experienced the losses at the corporate entity that actually held the certificates and experienced the losses.  Commerzbank held 51 of the certificates through German entities[8] and the remaining 23 certificates through a Cayman entity.[9]

---

[8]      Those certificates are ABSHE 2005-HE8, M5; ABSHE 2005 HE8, M6; ABSHE 2006 HE1, M7; BSABS 2005 EC1, M8; BSABS 2005-HE10, M3; BSABS 2005-HE4, M5; BSABS 2005-HE7, M3; BSABS 2005-HE9, M4; BSARM 2006-2, 3A3; CMLTI 2005-10, 1A34; CMLTI 2005-HE1, M6; CMLTI 2005-HE3, M5; CMLTI 2005-HE3, M6; CMLTI 2005-HE4, M6; CMLTI 2006-AR7, IA3B; CMLTI 2006-NC2, M2 Palmer; CMLTI 2006-WFHE2, M3; CMLTI 2006-WFHE2, M5 Palmer; CMLTI 2006-WFHE3, M6 Palmer; CMLTI 2007-AMC2, M4; CMLTI 2007-AR1, M1; CMLTI 2007-WFHE2, M3; FFMER 2007-2, A2D; GSAA 2006-12, M4; GSAA 2007-1, M3; HEAT 2005-2, B1; HEAT 2005-4, B1; HEAT 2005-4, M7; HEAT 2006-4, M7; HEAT 2007-2, M1; HEAT 2007-2, M3; JPALT 2006-A6, 2A8; JPMAC 2005-FRE1, M6; JPMAC 2005-FRE1, M7; JPMAC 2005-WMC1, M5; JPMAC 2005-WMC1, M6; JPMAC 2005-WMC1, M7; JPMAC 2006-CW2, MV3; MABS 2005-FRE1, M4; MABS 2006-AM2, A4; MABS 2006-AM3, A4; MABS 2006-NC2, M3; MARM 2007-HF2, A2; SABR 2006-WM1, A2C; SURF 2007-BC1, M5; WAMU 2007-OA2, B1; WAMU 2007-OA6, B1; WAMU 2007-OA6, B2; WMALT 2007-OA2, B1; WMALT 2007-OA2, B2; and WMALT 2007-OC1, A1 (collectively, the "German Certificates").

[9]      Those certificates are ABSHE 2006-HE5, M2; CHASE 2006-A1, 4A2; CMLTI 2006-NC2, M2 Barrington II; CMLTI 2006-WFHE2, M5 Barrington II; CMLTI 2006-WFHE3, M5; CMLTI 2006-WFHE3, M6 Barrington II; CMLTI 2006-WFHE4, M1; CMLTI 2007-WFHE1, M5; CMLTI 2007-WFHE1, M6; CSAB 2006-4, A6A; GSAMP

Indeed, this is not the first time that Commerzbank has argued that its claims on RMBS certificates accrued in England because it purchased the Certificates out of its London branch. Despite the fact that two judges in this district have rejected such a theory, Commerzbank continues to advance it. (Compare, e.g., Commerzbank's Opp. Br., ECF No. 322, at 9, with BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n, 247 F. Supp. 3d 377, 418 (S.D.N.Y. 2017) (rejecting Commerzbank's argument that because "[t]he sales of the Sold Certificates were made by London branch and the economic losses from those sales were experienced in Commerzbank in England" accrual occurred in England (quotation marks omitted)), and Commerzbank AG v. Deutsche Bank Nat'l Tr. Co. ("CB/DB"), 234 F. Supp. 3d 462, 471 (S.D.N.Y. 2017) (same).) "Even if all of the material decisions with respect to the purchase of the Certificates were made at the London branch of Commerzbank, Commerzbank ultimately felt its economic losses at its principal place of business and state of incorporation: Germany." CB/DB, 234 F. Supp. 3d at 471. As two judges in this district have done, this Court rejects Commerzbank's argument that the English statute of limitations should apply rather than the jurisdictions where Commerzbank actually held the certificates: Germany and the Cayman Islands.

> 3. German Statute of Limitations

Germany's statute of limitations is three years, beginning at the end of the calendar year when the claims are discovered. See CB/DB, 234 F. Supp. 3d at 472. Since

---

2006-HE5, M1; GSAMP 2006-HE6, M1; HEAT 2005-9, M2; HEAT 2006-6, M2; JPALT 2006-A6, 2A4; JPALT 2007-S1, M3; JPALT 2007-S1, M4; JPMAC 2006-CH1, M6; JPMAC 2006-CH2, MV2; JPMAC 2006-CH2, MV6; JPMAC 2006-NC2, M2; MLMI 2006-AHL1, M2; and MSM 2006-l5XS, A3 (collectively, the "Cayman Certificates").

Commerzbank filed this action on December 28, 2015, any claims arising out of the German Certificates and accruing on or before December 31, 2011, would be untimely.

The next step is to determine how claims accrue in Germany. While both parties submitted lengthy expert declarations to aid this Court in deciphering the German statute of limitations, the cases Commerzbank filed previously in this district are instructive.

The CB/DB court aptly summarized the German statute of limitations:

> [T]he relevant provision of German law is Section 195 of the German Civil Code, which has a three-year limitations period. That period begins to run at the end of the calendar year in which [i] the claim arose and [ii] the plaintiff either has knowledge of the circumstances giving rise to the claim and the identity of the defendant, or would have had such knowledge but for gross negligence. Bürgerliches Gesetzbuch [BGB] [Civil Code], § 199 . . . . [U]nder German law, a plaintiff has knowledge of the circumstances giving rise to the claim when she obtains knowledge of the facts necessary to commence an action in Germany with an "expectation of success" or "some prospect of success," though not without risk and even if the prospects of success are uncertain[.] To satisfy this standard, a plaintiff need not know all the relevant details or have conclusive proof available; knowledge of the factual circumstances underlying the claim is sufficient.

CB/DB, 234 F. Supp. 3d at 472 (fourth, fifth, and sixth alterations in original) (quoting IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc., 634 F. App'x. 19, 22 (2d Cir. 2015) (summary order)). The German statute of limitations has two prongs: (1) when the breach occurred, and (2) when the plaintiff has knowledge of the claims. The key to the second prong is when the plaintiff has "knowledge of the factual circumstances," with an "expectation of success" or "some prospect of success." CB/DB, 234 F. Supp. 3d at 472. While Commerzbank prevailed in Blackrock and CB/DB on its argument regarding the statute of limitations, those cases were decided on motions to dismiss. Indeed, this Court could not evaluate the merits of U.S. Bank's statute of limitations argument at the motion to dismiss stage. Commerzbank, 277

15

F. Supp. 3d at 490–91 ("At the pleading stage, this Court cannot determine whether Commerzbank had sufficient knowledge of each element of its claims with respect to any of the trusts at issue here.").  But on summary judgment, this Court can examine facts outside the four corners of the allegations in the Complaint.

      First, this Court notes that U.S. Bank's breaches occurred prior to December 2011.  In its response to U.S. Bank's 56.1, Commerzbank notes that "[i]n October 2007, U.S. Bank sent a series of notices to Servicers and Master Servicers addressing issues in their foreclosure practices that 'could affect the timing or cost associated with the disposition of any property.'"  (U.S. Bank 56.1 ¶ 205 (quoting Kane Ex. 169, at 1).)  And by March 2008, U.S. Bank had sent final certifications and exception reports identifying document defects in 39 trusts.  (U.S. Bank 56.1 ¶ 169.)  U.S. Bank's failure to cure within a prescribed period would constitute an EOD.  (See Compl. ¶ 107.)  Neither party disputes that cumulative loss EODs occurred in 2009 for a number of trusts.  (U.S. Bank 56.1 ¶¶ 263–64.)  Indeed, Commerzbank itself—in an effort to overcome U.S. Bank's arguments that pre- and post-EOD breaches did not occur—advances a mountain of evidence demonstrating that its claims accrued before December 2011.  These examples are but a fraction of the voluminous evidence that U.S. Bank sets forth that breaches occurred long before December 2011.

      Second, it is clear that Commerzbank had "knowledge of the factual circumstances," with an "expectation of success" or "some prospect of success" prior to December 2011.  CB/DB, 234 F. Supp. 3d at 472.  U.S. Bank cites an April 2007 internal email in which Commerzbank employees discuss general issues in the RMBS market, including other Trustee breaches.  (U.S. Bank 56.1 ¶ 88.)  An employee states specifically that he "suspect[s] that once people understand what occurred here, there's going to be a lot more."  (U.S. Bank

56.1 ¶ 88.)  Notably, Commerzbank's complaint contains allegations that U.S. Bank breached as

early as 2005.  (See, e.g., Compl. ¶ 75 ("U.S. Bank commenced foreclosure actions from 2005 to

2008 for numerous loans in which the Sponsors or Originators were at issue.").)  Commerzbank

also had access to U.S. Bank remittance reports in 2009 which detailed trust and loan specific

delinquency and foreclosure issues.  (U.S. Bank 56.1 ¶¶ 125–27.)

        Commerzbank attempts to circumvent these facts by arguing that it needed loan-

by-loan and trust-by-trust knowledge in order for the statute of limitations to begin to run.

However, that is the standard to survive summary judgment, not to consider when the statute of

limitations begins to run.  To trigger the statute of limitations, Commerzbank need only have

"knowledge of the factual circumstances," with an "expectation of success" or "some prospect of

success."  CB/DB, 234 F. Supp. 3d at 472.  Indeed, Commerzbank parried the motion to dismiss

largely on generalized market allegations.  Clearly, those generalized allegations on which

Commerzbank survived a motion to dismiss were sufficient to put them on notice of its potential

claims.  Moreover, this Court notes that Commerzbank was only able to amass trust-specific

evidence through discovery.  And a party must file a lawsuit to obtain discovery.  Carrying

Commerzbank's argument to its logical conclusion, the statute of limitations could not begin to

run until long after a plaintiff filed its lawsuit, thus vitiating the statute of limitations.

        Additionally, "under Section 199 of the German Civil Code, the statute of

limitations begins to run at the end of the calendar year in which . . . [the plaintiff] would have

had [actual knowledge of the circumstances giving rise to the claim and the identity of the

defendant] but for gross negligence."  IKB Deutsche Industriebank AG v. McGraw Hill Fin.,

Inc., 2015 WL 1516631, at *3 (S.D.N.Y. Mar. 26, 2015), aff'd, 634 F. App'x 19 (2d Cir. 2015)

(summary order).  German courts have found plaintiffs to be grossly negligent in failing to

pursue their claims when they "did not make obvious considerations . . . , cast them aside[,] or

[failed to notice facts that] should have been obvious to anyone in that particular scenario . . . ."

<u>Deutsche Zentral-Genossenschaftsbank AG</u>, 2013 WL 6667601, at *8 (quotation marks omitted).

"German courts will find that a plaintiff would have obtained knowledge but for gross

negligence if a plaintiff's lack of actual knowledge is the result of the plaintiff's manifest failure

to exercise the degree of reasonable care expected of a prudent person in the same position."

<u>Deutsche Zentral-Genossenschaftsbank AG</u>, 2013 WL 6667601, at *8 (quotation marks omitted);

<u>see also</u> <u>In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.</u>, 2014 WL 4162382, at *7 (C.D.

Cal. June 18, 2014) (holding that "sophisticated investors are charged with a heightened duty to

investigate possible claims under German law").

    Here, the Complaint heavily relies on generalized infirmities in the RMBS

market.  Indeed, Commerzbank began to work with outside counsel to investigate potential

claims in February 2011.  (U.S. Bank 56.1 ¶ 134.)  While that inquiry focused on Servicer

claims, the relation to Trustee claims is obvious.  Most claims against Trustees arise from a

servicer default EOD followed by the Trustee's failure to cure.  Since the record indicates that

U.S. Bank made little effort to cure, Commerzbank logically should have targeted actions against

the Trustees.  In light of these facts, it is hard to fathom how—but for gross negligence—

Commerzbank did not learn of facts sufficient to bring their claim.  Therefore, all of

Commerzbank's claims arising from the German Certificates are untimely.

    4. <u>Cayman Islands' Statute of Limitations</u>

    The Cayman Islands apply a six-year statute of limitations to contract claims.

(<u>See</u> Affidavit of Jayson Nathan Wood, ECF No. 296 ("Wood Affidavit"), ¶ 16 (citing Section 7

of the Cayman Islands Limitation Law (1996 Revision)); <u>see also</u> <u>House of Europe Funding I,</u>

Ltd. v. Wells Fargo Bank, N.A., 2014 WL 1383703, at *14 (S.D.N.Y. Mar. 31, 2014) (applying

the Cayman Island's six-year statute of limitations). The Cayman Islands also apply a six-year

statute of limitations for breach of trust claims. (See Wood Affidavit ¶ 17 (citing Section 27(3)

of the Cayman Islands Limitation Law (1996 Revision)).) If breach of fiduciary duty claims

arise from breach of contract, then a six-year statute of limitation will apply. (See Wood

Affidavit ¶ 18 (citing Tritton Dev. Fund Ltd. v. Fortis Bank (Cayman) Ltd., 2006 CILR 268

(Cayman Islands 2006)).) For breach of contract, the statute of limitations begins to run when

the breach occurs, (see Wood Affidavit ¶ 20), and breach of trust claims begin when the breach

occurs, (see Wood Affidavit ¶ 21).

Accordingly, to the extent Commerzbank's claims accrued prior to December 28,

2009, they would be untimely. U.S. Bank first argues—and Commerzbank does not dispute—

that for numerous loans within five trusts, U.S. Bank received breach notices. (U.S. Bank 56.1

¶ 180.) Ten of the Cayman Certificates realized losses prior to December 28, 2009. (U.S. Bank

56.1 ¶ 181.) U.S. Bank also notes that at least one of the rating agencies—Fitch, Moody's, and

S&P (collectively, the "Rating Agencies")—downgraded the Cayman Certificates prior to

December 28, 2009. (U.S. Bank 56.1 ¶ 182.)

However, this is all the evidence that U.S. Bank cites on the Cayman Certificates.

Indeed, U.S. Bank only dedicated seven lines in its brief to the timeliness of these claims. (See

U.S. Bank Opening Br., ECF No. 307, at 15.) This stands in sharp contrast to what U.S. Bank

advances to demonstrate that the German Certificates are untimely.[10] Moreover, U.S. Bank at

best only describes EODs in some of the trusts. U.S. Bank fails to demonstrate that these EODs

---

[10]     While this Court is sympathetic to the page-limits imposed on briefs, the parties submitted lengthy 56.1
statements. U.S. Bank submitted an 835-page 56.1, of which U.S. Bank used less than two pages to address the
Cayman Certificates.

ripened into post-EOD breaches by U.S. Bank.  Accordingly, U.S. Bank's motion for summary judgment dismissing the Cayman Certificates as untimely is denied.

        5.   Class-Action Tolling

Commerzbank seeks refuge in class-action tolling of the statute of limitations. See Vaccariello v. Smith & Nephew Richards, Inc., 763 N.E.2d 160, 162–63 (Ohio 2002), Commerzbank argues that the filing of class actions would toll the Ohio statute of limitations. Commerzbank is correct; however, Ohio's borrowing statute applies the shorter of Ohio's statute of limitations and the limitation in the jurisdiction where the claims accrued.  Here, the German statute of limitations extinguishes many of Commerzbank's claims.  Commerzbank fails to cite any authority that the German statute of limitations recognizes class-action tolling.  U.S. Bank notes that Germany does not recognize class-action tolling.  (Decl. of Dr. Mathias Rohe in Supp. of U.S. Bank's Mot. for Summ. J., ECF No. 348 ("Rohe Affidavit"), ¶ 110.)  Seeing no authority supporting Commerzbank's position, this Court declines to apply class-action tolling to Commerzbank's claims arising from the German Certificates.

IV.    Post-Event of Default Claims

This Court turns to U.S. Bank's substantive arguments, beginning with the post-EOD claims.  The Trustee has the duty of policing other deal parties to ensure each deal party fulfills its obligations.  Generally, post-EOD claims arise when there is: "(1) a material breach by the Servicer; (2) notice to the Servicer of the breach; and (3) the Servicer's failure to cure the breach within a designated period."  Commerzbank, 277 F. Supp. 3d at 491.  However, each PSA sets forth slight variations in the definition of an EOD.  At the motion to dismiss stage, these small differences were not controlling.  But at summary judgment, Commerzbank must show trust-specific breaches.  Thus, this Court is required to examine each PSA and the evidence

Commerzbank cites for a breach to determine whether U.S. Bank is entitled to summary judgment on each trust.

The PSAs provide that New York law will govern the PSAs.  (See Marcucci Ex. 26.)  Accordingly, this Court will apply New York law to interpret the obligations imposed by the PSAs.  See Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017) ("Contractual choice of law provisions are generally enforceable under both New York law and federal common law.").

A.  Prevention Doctrine

Generally, the prevention doctrine provides that "a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party [it]self."  Commerzbank, 277 F. Supp. 3d at 491 (alteration in original) (quotation marks omitted).  Under many of the PSAs, an EOD only occurs once U.S. Bank delivers written notice to the Servicer of a material breach.  This creates an anomaly where U.S. Bank's failure to provide notice to the Servicers would shield U.S. Bank from liability.  Commerzbank argues that under the prevention doctrine, U.S. Bank cannot rely on its own failure to give notice to escape liability.  Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n, 291 F.R.D. 47, 70 (S.D.N.Y. 2013), abrogated on other grounds by Ret. Bd., 775 F.3d 154; Bank of N.Y. v. Tyco Int'l Grp., S.A., 545 F. Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008).  The prevention doctrine is oft litigated in RMBS cases because certificateholders do not have access to loan files.  Therefore, they are unable to identify breaches that may trigger an EOD.

Notably, U.S. Bank previously argued that the prevention doctrine should not apply.  See Commerzbank, 277 F. Supp. 3d at 491–92.  This Court rejected that argument on the motion to dismiss.  Commerzbank, 277 F. Supp. 3d at 491–92.  U.S. Bank raises this argument

again, asserting that New York law has changed in the interim.  U.S. Bank points to two recent

New York Appellate Division decisions.  See Blackrock Balanced Capital Portfolio (FI) v. U.S.

Bank Nat'l Ass'n, 86 N.Y.S.3d 484 (App. Div. 2018); Fixed Income Shares: Series M v.

Citibank, N.A., 69 N.Y.S.3d 288 (App. Div. 2018).  In these cases, the First Department

reasoned the prevention doctrine is "not applicable [in RMBS cases] because it requires 'the

party's active conduct . . . preventing or hindering the fulfillment of the condition.'"  Blackrock

Balanced Capital Portfolio (FI), 86 N.Y.S.3d at 486 (quoting Fixed Income Shares: Series M, 69

N.Y.S.3d at 290).  In reaching that conclusion, the First Department held that "a defendant's

failure to send a notice to cure to the servicers is not 'active conduct' within the meaning of the

prevention doctrine."  Blackrock Balanced Capital Portfolio (FI), 86 N.Y.S.3d at 486.

        However, two judges in this district have rejected the First Department's

reasoning in Blackrock Balanced Capital Portfolio (FI) and Fixed Income Shares: Series M.  See

Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co., 410 F. Supp. 3d 662, 685

(S.D.N.Y. 2019); Pac. Life Ins. Co. v. Bank of New York Mellon, 2018 WL 1871174, at *1

(S.D.N.Y. Apr. 17, 2018).  In Nat'l Credit Union Admin. Bd., Judge Stein questioned the First

Department's reasoning, acknowledging that "[t]he First Department decisions do not explain

why failure to send notice is not 'active conduct' when such failure could plausibly have been

intentional or due to active frustration by the trustee nor did the decisions explain why 'active

conduct' is required to apply the logic of the prevention doctrine."  Nat'l Credit Union Admin.

Bd., 410 F. Supp. 3d at 685.  Because the First Department's explanation was perfunctory, Judge

Stein was "persuaded[ed] that 'the [New York] Court of Appeals would decide otherwise.'"

Nat'l Credit Union Admin. Bd., 410 F. Supp. 3d at 685 (quoting Reddington v. Staten Island

Univ. Hosp., 511 F.3d 126, 133 (2d Cir. 2007)).

This Court also believes that the New York Court of Appeals would not affirm these First Department decisions.  One of the primary purposes of a Trustee in the RMBS context is to evaluate Servicer performance and cure any Servicer deficiencies.  It would be counterintuitive to hold that a Trustee could avoid these duties by claiming it did not send written notice to an appropriate deal party when the Trustee is the only party in a position to learn of a servicer breach.  Such a proposition would frustrate the intent behind the PSAs' imposition of duties on a Trustee.  However, as discussed below, EODs occurred and the prevention doctrine is not Commerzbank's only theory of liability.  As such, this Court need not apply the prevention doctrine to Commerzbank's claims.

      B.  <u>Definitions of EODs under the PSAs</u>

Commerzbank alleges that EODs occurred in each of the 56 trusts at issue in this action.  The PSAs each contain detailed definitions of EODs.  Most definitions are similar.  The PSA governing the HEAT 2005-2 trust offers a paradigm and states, in pertinent part:

> (ii) any failure by a Servicer duly to observe or perform in any material respect any other of the  covenants or agreements on the part of such Servicer set forth in this Agreement, or if any of the representations and warranties of such Servicer in Section 2.03(a) proves to be untrue in any  material respect, which failure or breach continues unremedied for a period of 60 days after the  date on which written notice of such failure or breach, requiring the same to be remedied, shall  have been given to such Servicer by the Trustee or the Depositor, or to such Servicer and the  Trustee by the Holders of Certificates having not less than 25% of the Voting Rights evidenced by  the Certificates, provided, however, that in the case of a failure that cannot be cured within 60  days, the cure period may be extended if such Servicer can demonstrate to the reasonable satisfaction of the Trustee that such Servicer is diligently pursuing remedial action . . . .

(Excerpt of HEAT 2005-2 § 7.01(ii), Marcucci Ex. 36, at 1.)  This language is replicated in twelve other PSAs.[11]  While this example is instructive, because this Court must conduct a trust-by-trust analysis, each permutation of what constitutes an EOD needs to be examined.

Twenty-five of the trusts provide for Master Servicers with supervisory and enforcement obligations.[12]  In the Master Servicer trusts, the PSAs require the Master Servicer to "supervise, monitor and oversee the obligation of the Servicers" and "cause each Servicer to perform and observe the covenants, obligations and conditions to be performed or observed by such Servicer under its applicable Servicing Agreement . . . ."  (Excerpt from BSARM 2006-2 § 3.01, Kane Ex. 16, at 1.)

The PSAs next delineate how an EOD arises.  This generally occurs upon either (1) the Servicer receiving written notice of its breach or (2) the Servicer's actual knowledge of its breach.  Twenty-eight of the trusts require that the Servicer receive written notice of the breach.[13] For the Written Notice Trusts, the PSAs provide in pertinent part:

> Event of Default, wherever used herein, means any one of the following events: . . . failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement or any breach of a representation or warranty by the Master Servicer, which failure or breach shall continue unremedied

---

[11]     Those trusts are CHASE 2006-A1; FFMER 2007-2; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; MLMI 2006-AHLl; SURF 2007-BCl; WAMU 2007-OA2; WAMU 2007-OA6; WMALT 2007-OA2; and WMALT 2007-OCl.

[12]     Those trusts are BSARM 2006-2; ABSHE 2005-HE8; CMLTI 2007-AMC2; CSAB 2006-4; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; HEAT 2005-4; JPALT 2006-A6; JPALT 2007-S1; JPMAC 2006-CW2; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; MARM 2007-HF2; MSM 2006-15XS; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI 2006-AR7; CMLTI 2007-AR1; BSABS 2005-EC1; BSABS 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; and BSABS 2005-HE10 (collectively, the "Master Servicer Trusts").

[13]     Those trusts are BSABS 2005-EC1; BSABS 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; BSABS 2005-HE10; BSARM 2006-2; CHASE 2006-A1; CSAB 2006-4; FFMER 2007-2; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; HEAT 2005-2; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; JPALT 2006-A6; JPALT 2007-S1; JPMAC 2006-CW2; MLMI 2006-AHL1; MSM 2006-15XS; SURF 2007-BC1; WAMU 2007-OA2; WAMU 2007-OA6; WMALT 2007-OA2; and WMALT 2007-OC1 (collectively, the "Written Notice Trusts").

> for a period of 60 days after the date on which written notice of such
> failure shall have been given to Master Servicer by the Trustee or
> the Depositor, or to the Trustee and the Master Servicer by the
> Holders of Certificates evidencing not less than 25% of the Voting
> Rights evidenced by the Certificates . . . .

(Excerpt of BSABS 2005-EC1 § 8.01, Kane Ex. 37, at 10.)  Twenty-four of the trusts state that

an EOD occurs when the Servicer or Master Servicer has actual knowledge of a breach by a

Servicer or Master Servicer or written notice of such failure has been given to the Servicer or

Master Servicer.[14]  And in the Actual Knowledge Trusts, an EOD can occur upon "written notice

of such failure" or "actual knowledge of such failure by a Servicing Officer of the Master

Servicer or the Servicer . . . ."  (Excerpt of ABSHE 2005-HE8 § 7.01, Kane Ex. 37, at 1.)

      For the remaining four trusts,[15] the PSAs distinguish between Servicer EODs and

Master Servicer EODs.  A Servicer EOD occurs with either the servicing officer's actual

knowledge of the failure by the Servicer or written notice of the Servicer's failure.  (Kane Ex. 37,

at 19.)  A Master Servicer EOD occurs only after written notice of a Master Servicer breach is

given to the Trustee.  (Kane Ex. 37, at 19.)

      C.   <u>Whether Events of Default Occurred</u>

      Having laid out what constitutes an EOD under the PSAs, this Court turns to

whether EODs occurred in any the 56 trusts.  As discussed below, the evidence advanced by

---

[14]      Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE1; ABSHE 2006-HE5; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-AR7; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AR1; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; GSAMP 2006-HE6; JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1; JPMAC 2006-CH2; JPMAC 2006-NC2; MABS 2005-FRE1; MARM 2007-HF2; and SABR 2006-WM1 (collectively, the "Actual Knowledge Trusts").

[15]      Those trusts are CMLTI 2007-AMC2; MABS 2006-AM2; MABS 2006-AM3; and MABS 2006-NC2 (collectively, the "Split Trusts").

Commerzbank shows that U.S. Bank cannot demonstrate a lack of proof of EODs.  Accordingly, there is a material dispute of fact, and summary judgment is not warranted on this ground.

      1.  <u>Written Notice</u>

For all of the trusts, an EOD can occur on written notice to the Servicer or Master Servicer of a breach.  For the Written Notice Trusts, an EOD can <u>only</u> occur on written notice.

For all of the Written Notice Trusts, Commerzbank cites ample evidence in the form of Servicers or Master Servicers disclosures of noncompliance.  (Kane Ex. 42.)  For each of these trusts, U.S. Bank sent written notice of such noncompliance.  (Kane Ex. 42.)

Commerzbank also points to 80 annual statements and attestations of compliance from Servicers and Masters Servicers disclosing noncompliance.  Commerzbank demonstrates that for these 50 trusts,[16] written notice was provided regarding Servicer breaches. (Commerzbank 56.1 ¶ 312; Kane Ex. 42.)  These disclosures include, "[l]oss modifications not done in accordance with transaction agreements," (Kane Ex. 42, at 2), "[e]scrow accounts not paid in accordance with state laws," (Kane Ex. 42, at 10), "[f]ailure to conduct loss mitigation or recovery actions (foreclosures) within applicable timelines, insufficient procedures to monitor third-party servicing activities," (Kane Ex. 42, at 16), "[c]hanges to an obligor's loan were made without consent, loss mitigation or recovery actions not conducted within required timeframes,"

---

[16]     Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE1; ABSHE 2006-HE5; BSABS 2005-EC1; BSARM 2006-2; CHASE 2006-A1; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-AR7; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-AR1; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; CSAB 2006-4; FFMER 2007-2; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; GSAMP 2006-HE6; HEAT 2005-2; HEAT 2005-4; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; JPALT 2006-A6; JPALT 2007-S1; JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1; JPMAC 2006-CH2; JPMAC 2006-CW2; JPMAC 2006-NC2; MABS 2005-FRE1; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; MARM 2007-HF2; MLMI 2006-AHL1; MSM 2006-15XS; SABR 2006-WM1; SURF 2007-BC1; WAMU 2007-OA2; WAMU 2007-OA6; WMALT 2007-OA2; and WMALT 2007-OC1.

(Kane Ex. 42, at 58), and "[f]oreclosures were not conducted in accordance with Fannie Mae timelines," (Kane Ex. 42, at 65).

The PSAs also require the Servicers and Master Servicers to ensure that properties acquired by the trust through foreclosures are properly maintained.  These properties are called "real estate owned" or "REO."  The REO maintenance duties generally include: "(1) effecting the payment of taxes, assessments and other items that may result in a superior lien against the mortgage loans of the transactions; (2) timely recording all documents reflecting transfers of ownership; and (3) not taking any action that would prejudice or otherwise impair the interests of the trust."  (Kane Ex. 170, at 2.)  Commerzbank points to letters U.S. Bank sent to the Servicers and Master Servicers detailing their failures to maintain REO properties.  (See Kane Ex. 170.)  Because these documents were sent to the Servicers and Master Servicers themselves, they constituted the trust-specific EOD evidence required to survive summary judgment.  Commerzbank also identifies numerous instances where the City of New York imposed fines against REO properties held by seven trusts.[17]  (See Kane Ex. 182.)  And Commerzbank offers a December 9, 2009 letter from the City of Los Angeles cataloguing a number of U.S. Bank failures to maintain REO properties.  (See Marcucci Ex. 165.)  That letter put U.S. Bank on notice that REO properties were "in violation of California's nuisance laws," that U.S. Bank "permitted certain occupied foreclosed properties within the City [of Los Angeles] to become substandard and uninhabitable, in violation of [the California] Civil Code," and "U.S. Bank, the trusts, the servicers and the law firms have unlawfully evicted tenants from foreclosed properties within the City, in violation of the Los Angeles Rent Stabilization Ordinance."  (Marcucci Ex.

---

[17]        Those trusts are CMLTI 2005-HE3; CMLTI 2007-WFHE2; CSAB 2006-4; HEAT 2005-4; MABS 2005-FRE1; MABS 2006-AM2; and SABR 2006-WM1.

165, at 2.)  This included properties in WMALT 2007-OA2.  (Commerzbank's Counter-Statement of Undisputed Fact Pursuant to Local Rule 56.1, ECF No. 323-1 ("Commerzbank 56.1"), ¶ 399.)  Finally, Commerzbank notes that the City of Los Angeles sued U.S. Bank for its failure to maintain REO properties.  (See Kane Ex. 320.)  The REO properties at issue were held by 53 of the 56 trusts.[18]  (Commerzbank 56.1 ¶ 400; Kane Ex. 320.)  Indeed, U.S. Bank filed a cross complaint against the Servicers seeking compensation for their failure to maintain REO properties.  (Kane Ex. 320, at 45.)

For eleven trusts,[19] the PSA's require the Servicers or Masters Servicer to provide annual certification that they have fulfilled their obligations.  (Kane Ex. 21.)  Failure to provide these certifications also constitutes an EOD.  (Kane Ex. 21.)  For three of these trusts,[20] U.S. Bank sent letters to the Servicers regarding their deficient certifications.  (Kane Ex. 176.)  And for another six,[21] it did nothing even though it did not receive any compliance certificates.  (Kane Ex. 42.)

The PSAs require the Depositor to deliver the mortgage files for each loan to the Trustee.  (See Kane Ex. 23.)  The final certifications revealed thousands of exceptions in the Mortgage Files for nearly all of the trusts.  (See Decl. of Ingrid Beckles in Opp. of U.S. Bank's Mot. for Summ. J., ECF No. 326 ("Beckles Decl."), Ex. A ¶ 103.)  The Depositors received written notice of those deficiencies.  (Beckles Ex. A ¶ 103.)  This constituted an EOD for these

---

[18]    Only BSARM 2006-2; CHASE 2006-A1; and CMLTI 2007-AR1 trusts did not contain loans implicated by the suit.

[19]    Those trusts are ABSHE 2006-HE1; ABSHE 2006-HE5; CMLTI 2006-AR7; CMLTI 2007-AMC2; CMLTI 2007-AR1; CSAB 2006-4; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; MARM 2007-HF2; and GSAMP 2006-HE6.

[20]    Those trusts are ABSHE 2006-HE1; HEAT 2006-4; and HEAT 2006-6.

[21]    Those trusts are CSAB 2006-4; GSAMP 2006-HE5; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; and WAMU 2007-OA6.

trusts.  These disclosures are representative of the voluminous written notices Commerzbank puts forward.  This Court declines to delve further into this evidence as a concession to the mortality of man.  Accordingly, Commerzbank has demonstrated the existence of a question of material fact as to written notice.

        2.  <u>Actual Knowledge</u>

While Commerzbank has established EODs based on written notice for all 56 trusts, some of the trusts also provide for EODs based on a Servicer's or Master Servicer's actual knowledge of a breach.  One subset of trusts, the Actual Knowledge Trusts, provide that an EOD can occur when a Servicer or Master Servicer has actual knowledge of a breach.  Another subset, the Split Trusts, allow for EODs to occur based on the Servicer's—but not Master Servicer's—actual knowledge of a breach.  As with written notice, Commerzbank marshals ample evidence of actual knowledge of breaches for each of these trusts.

For all of the trusts, the PSAs require the Servicers and Master Servicers to send compliance statements to the Trustee certifying compliance with applicable regulations.  (<u>See</u> Kane Ex. 17.)  EODs occurred when Servicers and Master Servicers failed to provide such compliance statements.

For each of these trusts, Commerzbank submits evidence showing that Servicers or Master Servicers were sending compliance statements disclosing noncompliance with applicable regulations.  (<u>See, e.g.</u>, Kane Ex. 42, at 1 (noting "[c]ompliance certification from Wells Fargo Bank for the 2013 reporting year did not satisfy requirements of transaction documents"); Kane Ex. 42, at 6 (noting "[c]ompliance certification from CitiMortgage, Inc. for the 2013 reporting year did not satisfy requirements of transaction documents"); Kane Ex. 42, at

79 (noting "[c]ompliance certifications from Ocwen Loan Servicing for the 2013 reporting year did not satisfy requirements of transaction documents").)

Commerzbank also offers evidence that EODs occurred in 44 trusts[22] when Servicers or Master Servicers liquidated loans with document defects and failed to repurchase those loans.  (Beckles Ex. A ¶ 103.)  Moreover, Commerzbank also identifies tens of thousands of loans that were foreclosed or liquidated without repurchase.  (See Beckles Ex. A ¶ 103.)  This too constitutes an EOD in most of the trusts.

This Court is especially troubled by allegations that Servicers and Master Servicers falsified documents in foreclosure actions.  To support those allegations of EODs based on defective foreclosures, Commerzbank points to a Congressional Oversight Panel report.  (See Kane Ex. 253.)  That report details troubling practices in the mortgage finance industry regarding foreclosure practices.  However, it fails to enumerate trust-by-trust evidence of EODs.  Nor does the report constitute written notice of a breach or demonstrate actual knowledge of the Servicer or Master Servicer.

Commerzbank also offers a consent order with the Office of the Comptroller of Currency of the United States Department of Treasury (the "OCC").  The OCC found U.S. Bank engaged in "unsafe or unsound practices in residential mortgage servicing and in [U.S.] Bank's initiation and handling of foreclosure actions."  (Marcucci Ex. 195, at 1.)  While the findings in

---

[22]       Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE1; ABSHE 2006-HE5; BSABS 2005-EC1; BSABS 2005-HE10; BSABS 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; BSARM 2006-2; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-NC2; CMLTI  2006-WFHE3; CMLTI 2007-AMC2; CMLTI 2007-AR1; CMLTI 2007- WFHE1; CMLTI 2007-WFHE2; CSAB 2006-4; FFMER 2007-2; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; GSAMP 2006-HE6; HEAT 2005-2; HEAT 2005-4; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; JPALT 2006-A6; JPALT 2007-S1; JPMAC 2005- FRE1; JPMAC  2005-WMC1; JPMAC 2006-CW2; JPMAC 2006-NC2; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; MARM 2007-HF2; MLMI 2006-AHL1; MSM 2005-15XS; SABR 2006-WM1; WMALT 2007-OA2; and WMALT 2007-OC1 (collectively, the "Liquidated Loans Trusts").

this consent order are disturbing, this fails to detail trust-by-trust EODs sufficient to survive summary judgment.

Finally, Commerzbank cites a letter from the Association of Mortgage Investors ("AMI").  (See Kane Ex. 250.)  That AMI letter details "Pervasive Issues in RMBS Trusts." (Kane Ex. 250, at 1.)  It walks through Servicer issues ranging from failure to report representation and warranty breaches, improper servicing of delinquencies, robosigning, and unreasonable and unnecessary expenses.  (See Kane Ex. 250, at 4–13.)  However, the AMI letter describes platform-level issues with U.S. Bank's trustee business, not trust-by-trust EODs. Indeed, the AMI letter does not identify a single trust.  Accordingly, Commerzbank fails to show trust-by-trust EODs for defective foreclosures.

For two of the trusts,[23] EODs were triggered by either cumulative-loss events within the trust or Servicer downgrades.  A cumulative-loss event is defined by the PSAs as a delineated percentage decline of principal balance in the underlying loans.  (See Kane Ex. 20, at 3.)  In September 2009, GSAMP 2006-HE6 experienced a cumulative-loss event.  (Kane Ex. 328, at 5.)  On September 23, 2009, U.S. Bank sent notice of that EOD.  (Marcucci Ex. 68, at 2.) An EOD can also occur in these trusts when a Servicer's rating is "downgraded two or more levels . . . by one or more of the Rating Agencies . . . ."  (Kane Ex. 22.)  In April 2012, Moody's downgraded the Servicer's rating for CSAB 2006-4.  (Kane Ex. 331.)

Commerzbank identifies EODs based on faulty certifications, including certifications disclosing material noncompliance,[24] certifications that fail to comply with

---

[23]    Those trusts are GSAMP 2006-HE6 and CSAB 2006-4.

[24]    Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE5; BSABS 2005-EC1; BSARM 2006-2; CHASE 2006-A1; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-AR7; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-AR1; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; CSAB 2006-4; FFMER 2007-2; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; GSAMP 2006-HE6; HEAT 2005-2; HEAT 2005-4; HEAT 2005-9; HEAT 2006-4;

31

servicing regulations,[25] and certifications that were untimely[26] or undelivered.[27]  (Kane Ex. 42.)
Because the Servicers and Master Servicers sent certifications disclosing material non-
compliance, defective certifications, or failed to send certifications, this Court finds that there is
a genuine dispute as to whether the Servicers and Master Servicers had actual knowledge of
these breaches.

   For all of the Actual Knowledge and Split Trusts, EODs occurred because the
Servicers or Master Servicers had actual knowledge of their failure to service the mortgage loans
and failed to cure those material breaches.  (Kane Ex. 42.)  Accordingly, material issues of fact
abound as to whether EODs occurred.

V. Pre-Event of Default Claims

   Pre-EOD claims spring primarily from the Trustee's duty to receive a set of files
consisting of the mortgage note, the mortgage, any assignments, and the title insurance policy
(collectively, the "Mortgage File").  If the Mortgage File is defective, U.S. Bank must demand
that the Sponsor cure the defect or repurchase the loan.  Another source of pre-EOD claims
arises from alleged breaches of representations and warranties in the PSAs.  According to
Commerzbank, this occurred when U.S. Bank discovered that Sponsors and Originators failed to

---

HEAT 2006-6; JPALT 2006-A6; JPALT 2007-S1; JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1;
JPMAC 2006-CH2; JPMAC 2006-CW2; JPMAC 2006-NC2; MABS 2005-FRE1; MABS 2006-AM2; MABS 2006-
AM3; MABS 2006-NC2; MARM 2007-HF2; MLMI 2006-AHL1; MSM 2006-15XS; SABR 2006-WM1; SURF
2007-BC1; WAMU 2007-OA6; WAMU 2007-OA2; WMALT 2007-OA2; and WMALT 2007-OC1.

[25] Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE1; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI
2005-HE4; HEAT 2006-4; HEAT 2006-6; JPMAC 2005-FRE1; and MABS 2005-FRE1.

[26] Those trusts are ABSHE 2006-HE5; CMLTI 2006-AR7; CMLTI 2007-AMC2; CMLTI 2007-AR1;
GSAMP 2006-HE5; GSAMP 2006-HE6; and MARM 2007-HF2.

[27] Those trusts are ABSHE 2006-HE1; CSAB 2006-4; GSAMP 2006-HE5; HEAT 2006-4; HEAT 2006-6;
HEAT 2007-2; and WAMU 2007-OA6.

follow underwriting guidelines and U.S. Bank did not compel the Sponsor or Originator to repurchase the affected loan.

      A.  <u>U.S. Bank's Pre-Event of Default Duties</u>

           1.  <u>Document Defect Duties</u>

The PSAs impose a duty on the Trustees to demand documents, principally the Mortgage File. While there is some variance regarding the documents that constitute the Mortgage File, the PSAs all impose a duty to deliver that file. (Kane Ex. 31.) If the Originator or Seller fails to deliver the Mortgage File or it contains some defect, the Originator or Seller is required to repurchase the loan. The PSAs impose an obligation on U.S. Bank as Trustee to provide notice to the Originator or Seller if the Mortgage File is incomplete or noncompliant. (Kane Ex. 31.) And the PSAs require U.S. Bank to enforce the deal parties' obligations to repurchase loans with defective Mortgage Files within a prescribed period.

The PSAs impose a duty on U.S. Bank to compel repurchase of a loan if the Mortgage File is defective and the Originator fails to cure within a prescribed period. (Kane Ex. 10.) These PSAs generally require:

> Upon discovery or receipt of notice by the Depositor, the Master Servicer, the Trust Administrator or the Trustee of any materially defective document in, or that a document is missing from, a Mortgage File . . . the party so discovering or receiving notice shall promptly notify the other parties to this Agreement, and the Trustee thereupon shall promptly notify the related Originator and the Seller of such defect . . . and if the Originator or Seller, as applicable, does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Originator or Seller, as applicable, under the related Assignment Agreement (i) to repurchase such Mortgage Loan from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified (subject to Section 2.03(e)) of such missing document, defect or breach, and (ii) to indemnify the Trust Fund in respect of such missing document, defect or breach . . . .

(Excerpt from CMLTI 2005-HE1 § 2.03, Kane Ex. 10, at 1.)  Forty-eight of the trusts impose

notice and enforcement duties on U.S. Bank.[28]  (Kane Ex. 10.)  These duties are triggered by

discovery or notice of Mortgage File defects,[29] or by notice of Mortgage File defects.[30]  For a

number of other trusts, the PSAs designate a third-party "Securities Administrator" to effectuate

notice and enforcement duties on U.S. Bank's behalf.[31]  (Marcucci Ex. 222, at 3–4.)  For several

other trusts,[32] notice and enforcement duties rest with the Servicer, (Marcucci Ex 222, at 1–2),

and for a single trust,[33] those duties are given to the Depositor, (Marcucci Ex. 222, at 5).

      For 16 of the trusts,[34] the PSAs do not expressly provide that U.S. Bank has an

obligation to enforce other parties' obligations to repurchase loans where a material

---

[28]     Those trusts are CMLTI 2005-HE1; ABSHE 2005-HE8; ABSHE 2006-HE5; CMLTI 2005-10; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-AR7; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-AR1; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; GSAMP 2006-HE6; MABS 2005-FRE1; MSM 2006-15XS; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; JPALT 2006-A6; JPALT 2007-S1; JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1; JPMAC 2006-CH2; JPMAC 2006-CW2; JPMAC 2006-NC2; GSAA 2006-12; GSAA 2007-1; BSABS 2005-EC1; BSABS 2005-HE10; BSABS 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; FFMER 2007-2; HEAT 2005-2; HEAT 2005-4; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; MARM 2007-HF2; MLMI 2006-AHL1; SURF 2007-BC1; BSARM 2006-2; and GSAMP 2006-HE (collectively, the "Notice and Enforcement Trusts").

[29]     Those trusts are CMLTI 2005-HE1; ABSHE 2005-HE8; ABSHE 2006-HE5; CMLTI 2005-10; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-AR7; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-AR1; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; GSAMP 2006-HE6; MABS 2005-FRE1; BSABS 2005-EC1; BSABS 2005-HE10; 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; FFMER 2007-2; HEAT 2005-2; HEAT 2005-4; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; MARM 2007-HF2; MLMI 2006-AHL1; SURF 2007-BC1; and BSARM 2006-2.

[30]     Those trusts are MSM 2006-15XS; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; JPALT 2006-A6; JPALT 2007-S1; GSAA 2006-12; and GSAA 2007-1.

[31]     Those trusts are JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1; JPMAC 2006-CH2; JPMAC 2006-CW2; and JPMAC 2006-NC2.

[32]     Those trusts are WAMU 2007-OA2; WAMU 2007-OA6; WMALT 2007-OA2; and WMALT 2007-OC1.

[33]     That trust is FFMER 2007-2.

[34]     Those trusts are ABSHE 2006-HE1; BSABS 2005-EC1; BSABS 2005-HE4; BSABS 2005-HE7; BSABS 2005-HE9; BSABS 2005-HE10; BSARM 2006-2; CHASE 2006-A1; HEAT 2005-2; HEAT 2005-4; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; HEAT 2007-2; MLMI 2006-AHL1; and SABR 2006-WM1 (collectively, the "Benefit Trusts").

representation and warranty breach occurred. (Marcucci Ex. 224, at 1–2.) Rather, these PSAs require that "[t]he Trustee agree[] to hold the Trust Fund and exercise the [certificateholders' rights] for the benefit of all present and future [certificateholders] . . . ." (Excerpt of HEAT 2005-2 § 2.06, Marcucci Ex. 224, at 1.) This provision does not require U.S. Bank to enforce the obligations of other deal parties to repurchase loans. Commerzbank argues that the implied duty of good faith imposes a duty on U.S. Bank to enforce other deal parties' obligations. But the argument that good faith imposes additional contractual obligations on a party is not persuasive. See, e.g., W. & S. Life Ins. Co. v. Bank of N.Y. Mellon, 129 N.E.3d 1085, 1093–94 (Ct. App. Ohio 2019) (holding that PSAs requiring a Trustee to "exercise the rights referred to above for the benefit of all present and future Holders of the Certificates" is distinct from PSAs which contain express enforcement obligations). The PSAs are complicated and intricate agreements that impose numerous obligations. Engrafting a generalized good faith obligation that creates additional undefined duties is a bridge too far. Moreover, the PSAs expressly limit the duties of the Trustee. (See, e.g., excerpt of ABSHE 2006-HE1 § 8.01, Kane Ex. 25, at 3 ("Any permissive right of the Trustee enumerated in [the PSA] shall not be construed as a duty.").) Accordingly, U.S. Bank did not have enforcement obligations for the Benefit Trusts. As such, Commerzbank only has actionable claims for a select group of trusts.[35]

2. Representation and Warranty Duties

Commerzbank asserts that U.S. Bank failed to enforce other deal parties' repurchase obligations for representation and warranty breaches. These duties arise from the

---

[35]     Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE5; BSABS 2005-HE9; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-AR7; CMLTI 2006-NC2; CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-AR1; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; CSAB 2006-4; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; GSAMP 2006-HE6; JPALT 2006-A6; JPALT 2007-S1; MABS 2005-FRE1; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; MARM 2007-HF2; MSM 2006-15XS; and SURF 2007-BC1; (collectively, the "Pre-EOD Duty Trusts").

same clauses that prescribe U.S. Bank's Mortgage File pre-EOD duties.  These clauses generally read:

> Upon . . . discovery by the Trustee, the Depositor, the Seller or the related Originator of the breach by such Originator or Seller of any representation or warranty under the related Purchase and Servicing Agreement . . . which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders . . . the Trustee, or its designee, shall promptly notify the Depositor, the Certificate Insurer and the Seller or the related Originator . . . and if the Seller or related Originator, as applicable, does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee, shall enforce the obligations of the related Originator under the related Purchase and Servicing Agreement, as modified by the Acknowledgement, or the Seller under this Agreement, as applicable, and cause the related Originator or the Seller, as the case may be, to repurchase that Mortgage Loan . . . .

(Excerpt of MSM 2006-15XS § 2.05, Kane Ex. 10, at 3.)  Since these representation and warranty duties track the Mortgage File duties described earlier, and the PSAs do not impose a duty for the Benefit trusts, Commerzbank cannot proceed with its claims on those trusts.[36]

      B.   Pre-Event of Default Breaches

Commerzbank marshals evidence of pre-EOD breaches in all 56 of the trusts regardless of whether a trust imposes pre-EOD duties.  In that regard, Commerzbank identified 112,028 loans out of the 253,033 loans in 53 trusts that contain material Mortgage File defects.[37] (Beckles Ex. A ¶ 103.)  Commerzbank was able to identify Mortgage File representation and

---

[36]    Those trusts are the Pre-EOD Duty Trusts.

[37]    Those trusts include all 56 trusts, except for CHASE 2006-A1; JPMAC 2006-CH1; and JPMAC 2006-CH2.  Commerzbank asserts that U.S. Bank failed to produce any documents for CHASE 2006-A1; JPMAC 2006-CH1; and JPMAC 2006-CH2 relating to their Mortgage Files.

warranty breaches for nearly all of the trusts.[38]  These breaches include incomplete or defective

Mortgage Files consisting primarily of missing or deficient title insurance policies mortgage

notes.  (Kane Ex. 14.)

      Commerzbank also discovered that U.S. Bank received written notice of material

representation and warranty breaches for 4,245 loans underlying 31 trusts.[39]  (See Kane Ex. 38.)

For five of the trusts,[40] U.S. Bank received nearly 1,000 letters from deal parties identifying

thousands of loans with material Mortgage File representation and warranty breaches.  (Beckles

Ex. A ¶ 103.)

      C.   U.S. Bank's Failure to Cure

      Commerzbank submits significant evidence that U.S. Bank failed to cure

Mortgage File deficiencies and representation and warranty breaches.  U.S. Bank attempted to

enforce repurchase of defective loans in only two trusts.[41]  (Kane Ex. 222, at 2–3.)  And even

there, Commerzbank takes issue with U.S. Bank's to cause those loans to be repurchased.

Whether U.S. Bank fulfilled its obligations is a question of fact to be decided by a jury.

Accordingly, Commerzbank's Mortgage File and representation and warranty claims for the Pre-

EOD Duty Trusts may proceed to trial.

---

[38]     Those trusts are all 56 trusts, except for CMLTI 2006-WFHE2; CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-WFHE1; CMLTI 2007-WFHE2; JPMAC 2006-CH1; JPMAC 2006-CH2; JPMAC 2006-NC2; and MLMI 2006-AHL1.

[39]     Those trusts are ABSHE 2005-HE8; ABSHE 2006-HE5; BSABS 2005-HE9; BSABS 2005-HE10; CMLTI 2005-10; CMLTI 2005-HE1; CMLTI 2006-AR7; CMLTI 2007-AR1; GSAA 2006-12; GSAA 2007-1; GSAMP 2006-HE5; GSAMP 2006-HE6; HEAT 2005-2; HEAT 2005-4; HEAT 2005-9; HEAT 2006-4; HEAT 2006-6; JPALT 2006-A6; JPALT 2007-S1; MABS 2005-FRE1; MABS 2006-AM2; MABS 2006-AM3; MABS 2006-NC2; MLMI 2006-AHL1; MSM 2006-15XS; SABR 2006-WM1; SURF 2007-BC1; WAMU 2007-OA2; WAMU 2007-OA6; WMALT 2007-OA2; and WMALT 2007-OC1.

[40]     Those trusts are JPALT 2006-A6; JPALT 2007-S1; MABS 2006-AM2; MABS 2006-AM3; and MABS 2006-NC2.

[41]     Those trusts are HEAT 2006-6 and SURF 2007-BC1.

VI.   Tort Claims

        In addition to its contract claims, Commerzbank also brings tort claims.  First, Commerzbank alleges that U.S. Bank breached its fiduciary duties to certificateholders. Commerzbank asserts that U.S. Bank has "a fiduciary duty to act in good faith, avoid conflicts of interest when performing [its] obligations [under] in the PSAs, and to exercise all powers . . . prudently to protect certificateholders' rights once an Event of Default occurred or payments to certificateholders became impaired."  (Compl. ¶ 166.)  To discharge these duties, U.S. Bank must "protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following Events of Default, and enforce the repurchase obligations of the Sponsors and/or Originators."  (Compl. ¶ 166.)  Commerzbank alleges U.S. Bank "breached their fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest."  (Compl. ¶ 167.)

        Commerzbank also alleges that U.S. Bank negligently failed to avoid conflicts of interest and perform ministerial acts with due care.  Commerzbank argues that U.S. Bank owed Commerzbank "extra-contractual duties to perform ministerial acts with due care and avoid conflicts of interests" and that U.S. Bank "performed or failed to perform their responsibilities in a grossly inadequate and negligent manner."  (Compl. ¶ 170.)  Commerzbank asserts that U.S. Bank "negligently performed [its] ministerial acts by failing to provide notices of the numerous defaults that [it was] aware of under the PSAs," (Compl. ¶ 13), and negligently failed to fulfill its "obligation under the PSAs to review each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete," (Compl. ¶ 43).

A.  No-Action Clauses

The PSAs governing 17 trusts contain no-action clauses.[42]  These no-action

clauses generally read:

> No Certificateholder shall have any right by virtue of any provision
> of this Agreement to institute any suit, action or proceeding in equity
> or at law upon or under or with respect to this Agreement, unless (i)
> such Holder previously shall have given to the Trustee and Trust
> Administrator a written notice of default and of the continuance
> thereof, as hereinbefore provided, and (ii) the Holders of Certificates
> entitled to at least 25% of the Voting Rights shall have made written
> request upon the Trustee and the Trust Administrator to institute
> such action, suit or proceeding in its own name as Trustee or Trust
> Administrator hereunder and shall have offered to the Trustee or the
> Trust Administrator, as applicable, such indemnity satisfactory to it
> against the costs, expenses and liabilities to be incurred therein or
> thereby, and the Trustee or the Trust Administrator, for 15 days after
> its receipt of such notice, request and offer of indemnity, shall have
> neglected or refused to institute any such action, suit or proceeding.

(Excerpt of CMLTI 2005-HE3 § 11.03, Marcucci Ex 255, at 1.)  These clauses limit legal action

arising from the PSA absent such notice.  Generally, no-action clauses may not be read to bar

investor claims against an RMBS Trustee because it would be "absurd to require the debenture

holders to ask the trustee to sue itself."  Cruden v. Bank of N.Y., 957 F.2d 961, 968 (2d Cir.

1992).  But here, the no-action clauses in the 17 trusts do not require a demand on the Trustee—

rather, they only require a party to approach a different party, the Trust Administrator.  Such

clauses are regularly found enforceable to bar tort claims "absent bad faith."  Eaton Vance

Mgmt. v. Wilmington Sav. Fund Soc'y, FSB, 99 N.Y.S.3d 28, 30 (App. Div. 2019).

---

[42]     Those trusts are CMLTI 2005-HE3; CMLTI 2005-HE4; CMLTI 2006-NC2; CMLTI 2006-WFHE2;
CMLTI 2006-WFHE3; CMLTI 2006-WFHE4; CMLTI 2007-AMC2; CMLTI 2007-WFHE1; CMLTI 2007-
WFHE2; CSAB 2006-4; JPMAC 2005-FRE1; JPMAC 2005-WMC1; JPMAC 2006-CH1; JPMAC 2006-CH2;
JPMAC 2006-CW2; JPMAC 2006-NC2; and MARM 2007-HF2 (collectively, the "No-Action Trusts").

Notably, this Court previously dismissed all of Commerzbank's <u>contract</u> claims arising under the No-Action Trusts.  <u>See</u> <u>Commerzbank</u>, 277 F. Supp. 3d at 495–96.  Following that decision, U.S. Bank sought to clarify whether the dismissal of all claims arising under these 17 trusts included tort claims.  (ECF Nos. 278, 287.)  Because U.S. Bank only moved to dismiss the contract claims, this Court ruled that the non-contract claims survived.  (ECF No. 288.)  However, the same arguments this Court relied on in dismissing the contract claims apply with equal force to the tort claims.

Commerzbank argues that no-action clauses should be narrowly construed and clauses which reference EODs should not bar tort claims.  But a narrow reading of these no-action clauses does not dispense with the requirement that a demand be made on Trust Administrators.  Of note, one of the PSA's no-action clause expressly mentions EODs.  Specifically, the no-action clause in CSAB 2006-4 states, in part, "unless such Holder previously shall have given to the Trust Administrator a written notice of an Event of Default and . . ." a demand is made upon the Trust Administrator.  (Marcucci Ex. 255, at 3.)  The express language in this no-action clause requiring a plaintiff to provide EOD notice cabins this no-action clause to post-EOD claims.  Accordingly, U.S. Bank's motion for summary judgment on the No-Action Trusts is granted, except for CSAB 2006-4.

    B.  <u>Economic Loss Doctrine</u>

U.S. Bank moves for dismissal of all of Commerzbank's tort claims on the basis that they are precluded by the economic loss doctrine.  The economic loss doctrine provides that "a tort action for economic loss will not lie where the parties' relationship is governed by an express contract."  <u>Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n</u>, 328 F. Supp. 3d 141, 157–58 (S.D.N.Y. 2018) (quotation marks omitted).  Notably—as with the prevention doctrine—this

Court already ruled on application of the economic loss doctrine at the motion to dismiss stage. Commerzbank, 277 F. Supp. 3d at 496–97.  There, Commerzbank survived by pleading a "'non-waivable duty to exercise due care in the performance of ministerial acts required . . . in the course of the administration of the trust.'"  Commerzbank, 277 F. Supp. 3d at 496 (quoting Compl. ¶ 67).  This Court found that Commerzbank's negligence claims arising from conflicts of interest and failure to perform ministerial acts with due care arise independently from the contractual duties imposed by the PSAs.  Commerzbank, 277 F. Supp. at 496–97.

On summary judgment, U.S. Bank recycles its earlier arguments.  It reiterates that the PSAs provide specific contractually-based remedies and Commerzbank's tort claims are unvarnished contract claims.  U.S. Bank attempts to bolster its argument with an intervening decision by the New York Court of Appeals.  Dormitory Auth. v. Samson Constr. Co., 94 N.E.3d 456, 460 (N.Y. 2018).  There, the Court of Appeals dismissed tort claims for failure to exercise reasonable care, characterizing them as "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract."  Dormitory Auth., 94 N.E.3d at 461 (quotation marks omitted).  Notably, the court found that "the factual allegations set forth in each cause of action are identical, except that the negligence claim is framed in terms of [defendant]'s failure to comply with professional standards of care."  Dormitory Auth., 94 N.E.3d at 461 (emphasis in original).  None of Commerzbank's tort claims are identical to its contract claims, as discussed in this Court's earlier decision on the motion to dismiss.  See Commerzbank, 277 F. Supp. 3d at 496–99. Contrary to U.S. Bank's assertion, Dormitory Authority does not alter the economic loss doctrine.  New York courts have routinely dismissed tort claims that are identical to contract claims.  See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 194 (N.Y.

1987).  Because Commerzbank's tort claims differ from its contract claims, they are not barred

by the economic loss doctrine.

      C.   <u>Merits of Commerzbank's Tort Claims</u>

      Commerzbank offers ample evidence of U.S. Bank's misconduct.

        1.   <u>Fiduciary Duty Claims</u>

      Commerzbank argues that when an EOD occurred, U.S. Bank violated its duty of

loyalty to Commerzbank and other certificateholders.  Specifically, Commerzbank claims that

conflicts of interest compromised U.S. Bank and disincentivized it from taking actions adverse to

the interests U.S. Bank shared with Servicers.  (Compl. ¶¶ 7, 13, 35, 126–37.)  As discussed

earlier in this opinion, the sheer number of Servicer and Master Servicer breaches stands in stark

contrast to U.S. Bank's inaction.  Servicers and Master Servicers breached their obligations at

almost every stage through the financial crisis, including failure to provide annual certification,

(<u>see</u> Kane Ex. 42), faulty maintenance of REO properties, (<u>see</u> Kane Ex. 320), defective

Mortgage Files, (<u>see</u> Beckles Ex. A ¶ 103), and improper servicing of delinquencies,

robosigning, and unreasonable and unnecessary expenses, (<u>see</u> Kane Ex. 250).  Accordingly,

Commerzbank may proceed on its fiduciary duty claims.

        2.   Negligence or Gross Negligence Claims—Conflicts of Interest
              <u>and Performance of Ministerial Acts with Due Care</u>

      Commerzbank asserts negligence and gross negligence claims based on alleged

breaches of two extra-contractual pre-EOD duties: (1) to avoid conflicts of interest, and (2) to

perform ministerial tasks with due care.  To prove a conflict-of-interest claim, Commerzbank

must show "specific acts of self-dealing."  <u>Ellington Credit Fund, Ltd. v. Select Portfolio</u>

<u>Servicing, Inc.</u>, 837 F. Supp. 2d 162, 193 (S.D.N.Y. 2011).  U.S. Bank argues that Commerzbank

has not put forward evidence of such specific acts.  But, as discussed above, this Court is struck

by the frequency and breadth of Servicer breaches that came to U.S. Bank's attention.  U.S. Bank's paralysis in the face of such evidence is telling.  It raises a material question of fact about self-dealing that precludes summary judgment.

Commerzbank even provides evidence of U.S. Bank employees consciously avoiding Trustee obligations because of the potential adverse impact on U.S. Bank's business.  (See, e.g., Commerzbank 56.1 ¶ 495 (citing deposition testimony where a U.S. Bank employee discusses the fact that U.S. Bank considered that its actions would set a precedent for future actions); Kane Ex. 92 (email discussing not taking action to address servicing issues); Kane Ex. 338 (emails discussing public perception that U.S. Bank is acting more aggressive than other Trustees).)

Finally, U.S. Bank argues that reviewing Mortgage Files and sending notice of breaches are discretionary and not ministerial.  Therefore, breaching those duties cannot raise the specter tort liability.  This Court is constrained to agree.  While the record appears to support Commerzbank's contention that U.S. Bank's failure to monitor Servicers was tantamount to negligence, at a minimum, monitoring other deal parties is not a ministerial task.  See Commerce Bank v. Bank of N.Y. Mellon, 35 N.Y.S.3d 63, 65 (App. Div. 2016) ("A failure to monitor other parties 'plainly do[es] not involve the performance of basic non-discretionary ministerial tasks.'" (quoting Ellington, 837 F. Supp. 2d at 193) (alteration in original)).  U.S. Bank's duty to review the Mortgage File is analogous to the duty the New York Court of Appeals analyzed in Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A., 928 N.E.2d 396 (N.Y. 2010).  There, the New York Court of Appeals held that the trustee's duty to "assure the filing of accurate reports or risk default" was not "consistent with the limited, 'ministerial' functions of indenture trustees."  Racepoint Partners, 928 N.E.2d at 399.  Here, U.S. Bank is charged to review the

accuracy of Mortgage Files, including searching for defective or missing documents.  (See, e.g.,

Kane Ex. 10, at 1.)  Accordingly, Commerzbank's negligence claims are dismissed to the extent

they arise from U.S. Bank's duty to monitor other deal parties.

CONCLUSION

For the foregoing reasons, U.S. Bank's motion for summary judgment is granted

with respect to all claims arising from the Sold Certificates and the Duke Repo Certificates.

Summary judgment is also granted as to all claims arising from the German Certificates, but

denied as to the Cayman Certificates.  Summary judgment is denied as to all of Commerzbank's

post-EOD claims from the surviving certificates.[43]  Summary judgment is denied for

Commerzbank's pre-EOD claims arising from a select group of certificates.[44]  Finally, summary

judgment is granted in part and denied in part as to Commerzbank's tort claims.[45]  The Clerk of

Court is directed to terminate the motion pending at ECF No. 293.

Dated: April 28, 2020
      New York, New York                       SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

---

[43]     Those certificates are Cayman Certificates which were not sold and were not previously dismissed for containing no-action clauses.  Those certificates are ABSHE 2006-HE5, M2; CHASE 2006-A1, 4A2; GSAMP 2006-HE5, M1; GSAMP 2006-HE6, M1; HEAT 2006-6, M2; JPALT 2007-S1, M3; JPALT 2007-S1, M4; and MLMI 2006-AHL1, M2 (collectively, the "Surviving Post-EOD Certificates").

[44]     Those certificates are Surviving Certificates which impose pre-EOD duties.  Those certificates are the ABSHE 2006-HE5, M2; GSAMP 2006-HE5, M1; GSAMP 2006-HE6, M1; JPALT 2007-S1, M3; and JPALT 2007-S1, M4 (collectively, the "Surviving Pre-EOD Certificates").

[45]     Commerzbank's negligence claims arising from U.S. Bank's duty to monitor other deal parties are dismissed.  The surviving tort claims are those arising from the ABSHE 2006-HE5, M2; CHASE 2006-A1, 4A2; GSAMP 2006-HE5, M1; GSAMP 2006-HE6, M1; HEAT 2006-6, M2; JPALT 2007-S1, M3; JPALT 2007-S1, M4; MLMT 2006-AHL1, M2; and CSAB 2006-4, A6A (collectively, the "Surviving Tort Claim Certificates").